**UNITED STATES of America and David E. Nowak, IRS, Petitioners-Appellees,**

v.

**The UPJOHN COMPANY and Gerard Thomas in his official capacity, Respondents-Appellants.**

No. 78–1277.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1979.

Decided June 28, 1979.

---

Wallson G. Knack (Upjohn), Warner, Norcross & Judd, Grand Rapids, Mich., Charles A. McNelis (Upjohn), Welch & Morgan, Washington, D. C., for respondents-appellants.

James S. Brady, U. S. Atty., Grand Rapids, Mich., M. Carr Ferguson, Jerome Fink, Asst. Atty. Gen., Gilbert E. Andrews, Crombie J. D. Garrett, R. Bruce Johnson, Tax Div., Dept. of Justice, Washington, D. C., for petitioners-appellees.

Before CELEBREZZE, KEITH and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

The principal question on appeal is whether this Circuit should adopt the "control group" or the broader "subject matter" test as the standard for measuring the scope of the attorney-client privilege in the corporate context. Appellants, Upjohn Company and its in-house General Counsel, appeal from the District Court's order enforcing under 26 U.S.C. §§ 7402(b), 7604(a) (1976) an IRS summons for documents. The General Counsel refused to produce the

documents on the grounds that they are protected by company's attorney-client privilege and by the work-product doctrine. District Judge Fox rejected these arguments and enforced the summons. We adopt the "control group" test, affirm in part, reverse in part and remand.

While auditing Upjohn's 1972–73 consolidated federal income tax returns, the IRS learned that since January 1, 1971, Upjohn and its subsidiaries had made payments of approximately $4,400,000 to officials of many of the 136 foreign countries in which Upjohn does business. The company had directed its in-house counsel, along with outside counsel, to conduct an internal investigation of these payments. At the request of Upjohn's top management, officers and employees of the company were urged to respond to counsel's questions candidly and confidentially. The responses were recorded in answers to written questionnaires and in counsel's notes and memoranda describing oral interviews. These are the documents the IRS seeks to obtain in the instant proceeding.

The internal investigation was prompted, at least in part, by Upjohn's concern that the payments had not been reported properly to the Securities and Exchange Commission. The company filed two reports with the SEC disclosing some, but not all, of the details of the payments. The disclosures were voluntary in the hope of lenient treatment by the SEC. These reports to the SEC were made available to the IRS, which then commenced the instant investigation.

The company provided the IRS with details of $700,000 worth of the payments which it conceded might affect its federal income tax liability. The company furnished the IRS considerably less detailed information regarding the other $3,700,000 of questionable payments because the company claims that these payments do not affect its tax liability. Although the company made its employees available for questioning by the IRS, the company refused to permit questions about the $3,700,000 of questionable payments. The IRS claims that the company's limited disclosure has been inadequate to permit an independent evaluation of the possible tax implications of the payments. Accordingly, the IRS summoned from company counsel the documents generated in the course of the internal investigation and now seeks enforcement.

Upjohn claims that the communications to counsel made by all of its employees, including regular and middle management employees as well as top management, are privileged as confidential communications between client and attorney.[1] To the extent that the communications were made by officers and agents not responsible for directing Upjohn's actions in response to legal advice, we disagree for the simple reason that the communications were not the "client's."

The attorney-client privilege, as it exists today, is based on two related principles. The first is that it is an intrinsic part and a necessary incident of the attorney-client relationship. The legal profession has an intimate relationship with its clients and an important role in the administration of our system of justice. Privacy is the necessary context of the relationship between the individual and his lawyer. As stated by Dean McCormick:

> Our adversary system of litigation casts the lawyer in the role of fighter for the party whom he represents. A strong sentiment of loyalty attaches to the relationship, and this sentiment would be outraged by an attempt to change our customs so as to make the lawyer amenable to routine examination upon the client's confidential disclosure regarding professional business. Loyalty and sentiment

---

1. *See* VIII J. Wigmore, Evidence, § 2292 at 558 (McNaughton Rev. 1940):

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

are silken threads, but they are hard to break.[2]

The second principle is that the privilege "encourage[s] clients to make full disclosure to their attorneys."[3] This policy of promoting full disclosure to counsel serves to implement the notion inherent in the first principle, that finding the truth and achieving justice in an adversary system are best served by fully-informed advocates loyal to their client's interests.

The application of the privilege to corporate "clients" poses a somewhat different problem. Since corporations are inanimate, artificial entities, the attorney-client relationship is conceptually more difficult, and its underlying principles are less obvious. As clients, corporations can communicate to attorneys only through agents. Moreover, corporations, unlike individuals, are organized in such a way that responsibilities, and the information needed to fulfill the responsibilities, are delegated and compartmentalized. Thus, marketing officials have knowledge and duties related only to selling, while plant supervisors have knowledge and duties related only to production. It is only the senior management, guiding and integrating the several operations, which can be said to possess an identity analogous to the corporation as a whole.

Courts have generally recognized that the attorney-client privilege applies to corporations so long as the attorney-client relationship was initiated and pursued by the company's management.[4] Any communication made by top management to the corporation's attorney, which otherwise meets the requirements of the attorney-client privilege, is protected from disclosure.

The difficulty arises when, after the attorney-client relationship has been established by the top management, communications are made to counsel by subordinate corporate agents and employees. Some courts, notably the Seventh and Eighth Circuits, have adopted the position that such communications are privileged if certain conditions are met. The specification of the conditions varies, but the sum and substance are similar: If the agent is in possession of information acquired in the ordinary course of business relating to the subject matter of his employment, and the information is communicated confidentially to corporate counsel to assist him in giving legal advice to the corporation, then the communication is privileged.[5] Under this "subject-matter" approach, the privilege does not cover communication of pre-existing documents prepared for independent business reasons[6] or communications unrelated to the subject matter of the agent's employment.[7] Other courts have adopted a narrower approach which covers only those communications made by the so-called "control group" of the corporation, namely, those officers, usually top management, who play a substantial role in deciding and directing the corporation's response to the legal advice given.[8] It is our opinion that

2. McCormick, Evidence § 87 at 176 (2d ed. 1972).

3. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

4. *E. g., Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968).

5. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (*en banc*); *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970) (*per curiam*), *aff'd without opinion by an equally divided Court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971).

6. *See, e.g., Diversified Industries, supra* note 5 at 609.

7. *Id. Cf. Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947) (". . .

the protective cloak of [the attorney-client] privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation.")

8. *In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir. 1979); *Natta v. Hogan, supra* note 4; *In re Grand Jury Subpoena*, 81 F.R.D. 691 (S.D. N.Y.1979), *rev'd on other grounds* 599 F.2d 504 (2d Cir. 1979). *Virginia Electric & Power Co. v. Sun Shipping and Dry Dock Co.*, 68 F.R.D. 397 (E.D.Va.1975); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974); *Honeywell, Inc. v. Piper Aircraft Corp.*, 50 F.R.D. 117 (M.D. Pa.1970); *Garrison v. General Motors Corp.*, 213 F.Supp. 515 (S.D.Cal.1963); *City of Philadelphia v. Westinghouse Electric Corp.*, 210 F.Supp. 483 (E.D.Pa.), *mandamus denied sub nom. General Electric Co. v. Kirkpatrick*, 312

the "subject matter" approach goes too far, and we align ourselves with the courts that have adopted the "control group" analysis. The "subject matter" test encourages senior managers purposely to ignore important information they have good business reasons to know and use. Corporate counsel should not be the exclusive repository of unpleasant facts. The law should not encourage corporate managers to shield themselves from information about possibly illegal transactions. Such purposeful ignorance does not serve the interests of moral corporate conduct or the protection of stockholder equity.

In addition, the scope of the attorney-client privilege should be limited to its purpose because the privilege acts as a bar to the discovery of the truth.[9] The "control group" test recognizes that a corporation's decision-makers, like individual clients, must communicate freely and confidentially to counsel. By protecting these communications, the "control group" test promotes consultation with counsel and thereby achieves its objective.[10] At the same time, the "control group" test guards against undue limitation of evidence. The "subject matter" approach enables the corporation's management—via agents—to "communicate" to counsel the details of transactions about which management is only dimly aware and to have these communications protected by the attorney-client privilege. Thus, once management is informed in a general way of transactions posing legal problems, it can order subordinate agents to communicate the full details directly to counsel. Because the "subject matter" test brings these communications within the attorney-client privilege, it tends to encourage this type of indirect communication to counsel. This, in turn, fosters situations in which the *only* record of the full details of a particular transaction is in the hands of corporate counsel and, under the "subject matter" test, undiscoverable. Discovery, then, would have to be directed at the corporate agents who know the details of the transaction rather than at the corporation's management. When the knowledgeable agents are located in several foreign countries, as here, the burden on discovery is severe. We, therefore, decline to accept Upjohn's argument because of the broad "zone of silence" it would tend to create.[11]

 Upjohn argues, however, that some of the communications in this case were made by members of the "control group." This point is well taken. The record indicates that, in the course of their investigation, Upjohn's counsel interviewed a number of senior corporate officers, including the Chairman of the Board, the Vice Chairman, and the President. These senior officers, and possibly others, are in all likelihood members of the "control group" and their communications to counsel should be privileged.[12] Therefore, we re-

F.2d 742 (3d Cir. 1962), *cert. denied* 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963). *See also Mead Data Central, Inc. v. U. S. Dep't of Air Force*, 184 U.S.App.D.C. 350, 361, 566 F.2d 242, 253 n.24 (1977).

9. *United States v. Goldfarb*, 328 F.2d 280, 282 (6th Cir. 1964).

10. *See generally* Kubak, *The Uneven Application of the Attorney Client Privilege to Corporations in the Federal Courts*, 6 Ga.L.Rev. 339 (1972); Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test*, 84 Harv.L.Rev. 424 (1970).

11. Simon, *The Attorney-Client Privilege as Applied to Corporations*, 65 Yale L.J. 953, 955 (1956). We recognize that, historically, individual clients' communications with counsel via agents have been deemed privileged. *E. g., In re Aspinwall*, 2 Fed.Cas.No. 591 (S.D.N.Y.

1874). We believe, however, that this principle should be limited to agents who, at the client's request, communicate *facts known to the client. See e. g., Reid v. Langlois*, 41 Eng.Rep. 1408 (1849); *see generally* Morgan, Basic Problems of Evidence 100–01 (1954); Simon, *The Attorney-Client Privilege, supra*, at 963–64.

12. The corporation's voluntary disclosures to the SEC amount to a waiver of the privilege only with respect to the facts actually disclosed. *United States v. Cote*, 456 F.2d 142 (8th Cir. 1972); *United States v. Judson*, 322 F.2d 460, 461 (9th Cir. 1963); *Colton v. United States*, 306 F.2d 633, 639 (2d Cir. 1962), *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *IBM v. Sperry Rand Corp.*, 44 F.R.D. 10 (D.Del.1968). *See generally* McCormick, Evidence § 93 (2d ed. 1972).

mand the case to the District Court to determine which communications sought by the IRS were made by members of the "control group" and to deny enforcement of the summons with respect to these "control group" communications.[13]

Affirmed in part, reversed in part and remanded.

**13.** Upjohn's other arguments that the work-product doctrine and principles of relevancy shield it from disclosure are not well founded. The work-product doctrine of *Hickman v. Taylor, supra* note 7, and Fed.R.Civ.P. 26(b)(3) is not applicable to administrative summonses issued under 26 U.S.C. § 7602. The IRS simply must show that the inquiry is relevant to a good faith investigation conducted pursuant to a legitimate purpose, that the information sought is not in the IRS' possession and that proper administrative procedures have been followed. *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). *See also United States v. Coopers & Lybrand,* 550 F.2d 615 (10th Cir. 1977); *United States v. Davey,* 543 F.2d 996 (2d Cir. 1976); *United States v. Matras,* 487 F.2d 1271 (8th Cir. 1973); *United States v. Theodore,* 479 F.2d 749 (4th Cir. 1973); *United States v. McKay,* 372 F.2d 174 (5th Cir. 1967).

There is no reason why the IRS should be required to take on faith Upjohn's assurances that $3,700,000 in questionable payments had no tax consequences, especially in view of the company's admission that $700,000 in questionable payments did affect its tax returns. The fact that the IRS investigation is focused on the years 1972–74 does not mean that records after 1974 might not shed light on the earlier years' returns. Moreover, the IRS is not precluded from expanding its investigation into 1975 and later years should the facts warrant. The inquiry, therefore, is relevant to a legitimate investigation of Upjohn's tax liability. Upjohn has not argued that the IRS has acted in bad faith, that the proper administrative procedures have not been followed, or that the information sought is already in the hands of the IRS. Accordingly, the IRS is entitled to have its summons enforced as to all non-privileged material.