**286**

In re the Application for an order
compelling discovery in
JARVIS, INC. et al.

v.

AMERICAN TELEPHONE & TELE-
GRAPH CO. et al., Case No. 74–1674,
United States District Court for the Dis-
trict of Columbia.

Civ. A. No. 79–X–115.

United States District Court,
D. Colorado.

Oct. 16, 1979.

James M. Lyons, Lynn Petros, Robert Slosky, Rothgerber, Appel & Powers, Denver, Colo., for plaintiffs (movants).

Stuart S. Gunckel, Anne M. Gorsuch, Denver, Colo., Stuart C. Stock, Covington & Burling, Washington, D. C., for defendants (respondents).

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge.

THIS CASE involves the operation of the attorney-client and work product privileges in the corporate setting. The matter is before the Court on the motion for order compelling discovery filed by movants on August 17, 1979. This Court has jurisdiction to entertain the motion pursuant to the provisions of Rule 37(a)(1), Fed.R.Civ.P. The Court has had the opportunity to review the briefs filed by the parties and the transcripts of the two evidentiary hearings. Upon careful consideration, the Court finds that the motion to compel is granted in part and denied in part.

### I.

The movants are plaintiffs in an antitrust action presently pending in the United States District Court for the District of Columbia, *Jarvis, Inc., et al. v. American Telephone and Telegraph Co., Inc., et al.,* 481 F.Supp. 120 (D.D.C.). Pursuant to the Federal Rules of Civil Procedure, the movants noticed the deposition of James W. Kirchhoff, an employee of the Mountain States Telephone and Telegraph Co., Inc. [hereinafter Mountain Bell]. Mr. Kirch-

hoff was also asked to produce documents relating to the ComKey 718 and ComKey 1434 key telephone systems.

The movants sell and lease business telephone terminal equipment in competition with the Bell System.[1] Their complaint in *Jarvis* alleges violations of Sections 1 and 2 of the Sherman Act. The named defendants in *Jarvis* are American Telephone and Telegraph Co., Inc., [hereinafter AT&T], Bell Telephone Laboratories, Inc., Western Electric Co., Inc., and Chesapeake and Potomac Telephone Co., Inc. Mountain Bell is not a named party in *Jarvis*, but the complaint does refer to all of the individual operating companies in the Bell System as unnamed co-conspirators.

The deposition of Mountain Bell, by and through its employee Mr. Kirchhoff, was commenced on August 16, 1979. During the course of the deposition, Mr. Kirchhoff testified that from March 1978 until February 1979 his title was "Assistant Vice President—Antitrust Matters" [hereinafter VP–Antitrust]. As such, Mr. Kirchhoff, who is not an attorney, was charged with investigating alleged antitrust violations by Mountain Bell. He worked with and under the direction of Stuart S. Gunckel, Esq., Vice President, General Counsel and Secretary of Mountain Bell.

In his position as VP–Antitrust, Mr. Kirchhoff had between 10 and 20 persons working under his direction. This staff was not permanently assigned to him; he obtained their services on a full-time basis as he needed additional help. These staff persons were regular employees of Mountain Bell, and none were attorneys. Mr. Kirchhoff and the staff persons signed confidentiality agreements in connection with their antitrust work. Mr. Kirchhoff was officed with the Legal Department, while his staff worked out of an auditorium on the same floor.

Mr. Kirchhoff and his staff investigated some 150 alleged incidents involving Moun-

tain Bell and antitrust matters. Mr. Kirchhoff received his assignments or leads of incidents to investigate mainly from the Legal Department of AT&T through Mr. Gunckel. Many of the alleged incidents came to light as a result of other antitrust suits pending against AT&T. The government's answers to interrogatories in *United States v. AT&T*, 427 F.Supp. 57 (D.D.C.) were a prime source of incidents which Mr. Kirchhoff was asked to investigate.

Mr. Kirchhoff testified that he had very little information about each incident on which to proceed because the interrogatory answers were often quite brief and vague. Drawing upon his knowledge of Mountain Bell operations, he would suggest approaches for his staff. An investigation usually consisted of phone calls to persons within Mountain Bell who might have information about an incident. If the person called had no information, he was asked if he knew of any person who might possess such information. The investigations were thus carried out largely through knowledge of Mountain Bell operations and through use of a corporate phone directory. Indeed, Mr. Kirchhoff was selected for the position in part because of his extensive knowledge of Mountain Bell operations.

Mr. Kirchhoff was aided in his investigations by a letter issued by R. K. Timothy, President of Mountain Bell. The letter explained the purpose of Mr. Kirchhoff's special task force and stated that he and Mr. Gunckel had "specific authority from me [Mr. Timothy] to enlist anyone's participation in their work at any time and with minimal notice." The letter, dated March 14, 1978, further noted that "In order to preserve the confidentiality and legal product which will result from the activities of this task force, the whole effort will be under the direct control and supervision of our attorneys."

Upon completion of investigation of an incident, Mr. Kirchhoff or his staff wrote a

---

1. Through the use of the term "the Bell System," the Court refers to the twenty-some companies affiliated with American Telephone and Telegraph Co., including Western Electric Co., the Bell Telephone Laboratories and the individual operating companies, including Mountain Bell.

factual summary of what they thought had transpired.

During the course of Mr. Kirchhoff's deposition, movants first became aware of his VP–Antitrust position, his investigations and the existence of similar positions in other Bell System companies. Movants endeavored to find out much from Mr. Kirchhoff during the deposition about his activities. However, counsel for Mountain Bell instructed him not to answer certain questions, claiming attorney-client and work product privileges. The matter now before the Court is a motion to compel answers to questions certified at Mr. Kirchhoff's deposition.

## II.

Before turning to the merits of this lawsuit, several observations must be made. As previously recognized, the *Jarvis* case is not before this Court or in this District. Indeed, not one of the over forty antitrust cases pending against AT&T and the Bell System has been filed in this District. This Court is hesitant to become, in effect, the "discovery court" for *Jarvis* or any of the other pending suits. This concern is heightened by the fact that each of the operating companies in the Bell System has or had a person in a position similar to the one occupied by Mr. Kirchhoff.

In recognition of these factors, it must be emphasized that the only matters presently before the Court are the questions certified at the deposition. These questions fall into six categories:

1. Specific allegations of conduct which Mr. Kirchhoff was asked to investigate;

2. Description of organization system for documents in *United States v. AT&T*;

3. Substance of Mr. Kirchhoff's deposition testimony in *Litton Systems, Inc. v. AT&T*;

4. Three specific instances identified by Mr. Kirchhoff;

5. National meetings of Bell System lawyers and Mr. Kirchhoff's antitrust-advisor counterparts in the other companies, and

6. Video tapes shown in Denver to Mr. Kirchhoff and his staff on antitrust information gathering.

These are the only areas of inquiry before the Court and they are before the Court in the form certified at the deposition. This Court cannot and will not broaden the scope of the inquiry in this proceeding, in spite of the expansive characterizations urged upon the Court by the parties.

## III.

Respondents contend that Mr. Kirchhoff need not answer the questions certified at the deposition because the information sought is protected by the attorney-client privilege. They claim that Mr. Kirchhoff was acting as the agent of counsel, that the information sought was obtained by Mr. Kirchhoff from the client in confidence for the purpose of securing legal advice and assisting in pending litigation, and that the privilege is claimed by the client and not waived. *United States v. United Shoe Machinery Co.*, 89 F.Supp. 357 (D.Mass.1950) contains the most frequently cited statement of the privilege, and need not be quoted in full here. *See*, 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961).

A persuasive opinion in this Circuit dealing with the attorney-client privilege in the corporate setting is *Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968). In *Hogan*, the Circuit Court adopted a control group test for determining which corporate employees should be deemed to speak for the corporation in the context of the attorney-client privilege. "(T)he test is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice of a lawyer, or is an authorized member of a group that has such power." 392 F.2d at 692.

The control group test has recently been adopted by two other Circuit Courts faced with similar problems. In *In Re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir. 1979) the court dealt with a grand jury subpoena seeking memoranda of counsels'

interviews with employees of Sun Co., Inc. The investigation was instigated at the request of top management and involved possibly illegal payments made in connection with Sun Co.'s foreign operations. Noting that "a clear majority of federal courts adhere to the control-group test," the court goes on to discuss the various rules advanced by courts and commentators in the light of the purpose of the attorney-client privilege.

The privilege is designed to encourage candid communication between attorney and client. 8 Wigmore, Evidence § 2291 (McNaughton rev. 1961). Recognizing an attorney's need to secure information from lower echelon employees, the court questions the utility of the attorney-client privilege in encouraging disclosure.

> The "confidentiality" offered to non-control-group employees would be quite illusory from their stand point. Because they have no control over the privilege itself, their communications remain confidential only in the sense that they are not released to outsiders, and only so long as the corporate control group desires to assert the privilege. If the employees had engaged in questionable activity, the corporation clearly would have the power to turn the employees' statements over to law enforcement officials. Privilege or no privilege, lower-level employees would confide in corporate counsel at their own risk. Conversely, where no questionable activity is involved, non-control-group employees have little reason not to relate information to corporate counsel, especially where a supervisor has instructed them to do so. 599 F.2d at 1236.

The court goes on to conclude that the control group test strikes the proper balance between the policy behind the attorney-client privilege and the policy limiting evidentiary privileges so as to interfere with the truth gathering process as little as possible.

In *United States v. Upjohn Co.*, 600 F.2d 1223 (6th Cir. 1979) the IRS sought to obtain discovery of documents compiled by Upjohn's counsel during the course of an internal investigation of payments made to foreign government officials. As in the case before us now, the top management of Upjohn had urged officers and employees to respond to counsels' questions "candidly and confidentially." Responses had been recorded in written questionaires and counsels' notes of oral interviews.

Upjohn claimed that communications by all its employees to counsel were privileged under the attorney-client doctrine. "To the extent that the communications were made by officers and agents not responsible for directing Upjohn's actions in response to legal advice, we disagree for the simple reason that the communications were not the 'client's.'" 600 F.2d at 1225. The court also indicates that "It is only the senior management, guiding and integrating the several operations, which can be said to possess an identity analogous to the corporation as a whole." 600 F.2d at 1226.

The subject matter test which respondents urge upon us extends the attorney-client privilege to a broader range of corporate employees than does the control group test. The court in *Upjohn* points to two problems posed by the subject matter test: the danger of encouraging corporate management not to communicate directly with subordinates regarding possibly illegal transactions and the burden which this test places on discovery.

> The "subject matter" test encourages senior managers purposely to ignore important information they have good business reasons to know and use. Corporate counsel should not be the exclusive repository of unpleasant facts. . . .
>
> The "subject matter" approach enables the corporation's management—via agents—to "communicate" to counsel the details of transactions about which management is only dimly aware and to have these communications protected by the attorney-client privilege. . . . This, in turn, fosters situations in which the *only* record of a particular transaction is in the hands of corporate counsel and, under the "subject matter" test, undiscoverable. 600 F.2d at 1227 (emphasis in original).

The majority of courts which have considered the issue have adopted the control group test. *City of Philadelphia v. Westinghouse Electric Corp.*, 210 F.Supp. 483 (E.D.Pa.1962), *mandamus and prohibition denied sub nom. General Electric Corp. v. Kirkpatrick*, 312 F.2d 742 (3d Cir. 1962), *cert. denied* 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963); *Garrison v. General Motors Corp.*, 213 F.Supp. 515 (S.D.Cal.1963); *American Cyanamid Co. v. Hercules Powder Co.*, 211 F.Supp. 85 (C.D.Del.1962); *Congoleum Industries, Inc. v. G. A. F. Corp.*, 49 F.R.D. 82 (E.D.Pa.1969), *aff'd* 478 F.2d 1398 (3d Cir. 1973); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.C.Md.1974); *In Re Anthracite Coal Antitrust Litigation*, 81 F.R.D. 516 (M.D.Pa.1979); *Honeywell, Inc. v. Piper Aircraft Corp.*, 50 F.R.D. 117 (M.D.Pa.1970); *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.*, 68 F.R.D. 397 (E.D.Va.1975). A thoughtful discussion of the strengths of the control group test appears in Note, *Attorney-Client Privilege for Corporate Clients*, 84 Harv.L. Rev. 424 (1970).

The respondents argue that the better rule is the subject matter test first set forth by the Seventh Circuit in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam by an equally divided Court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), *rehearing denied* 401 U.S. 950, 91 S.Ct. 917, 28 L.Ed.2d 234 (1971). In contrast to the control group test, the subject matter test looks to the content of the communication rather than to the position of the employee making the communication. Communications made at the direction of supervisory personnel are deemed privileged if the subject matter of the communication and the subject matter of the advice sought by the corporation both involve the performance by the employee of the duties of his employment.

The *Harper & Row* approach was adopted in part in response to criticism that the control group test limits the information which corporate counsel can obtain from lower level corporate employees. However, the decision has itself been soundly criticized. *See, e. g.,* J. Weinstein and M. Berger, Weinstein's Evidence ¶ 503(b)[04], at 503–44. As a result, the modified version of the *Harper & Row* approach suggested in the treatise was adopted by the Eighth Circuit in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978). *Diversified Industries* has also received criticism as being too vague regarding which communications are protected. Note, *Alternative Test Declared for Attachment of Attorney-Client Privilege to the Corporate Client*, 1 Wash.U.L.Q. 256 (1979); Kazlow, *Corporations—Attorney-Client Privilege*, 47 Geo.Wash.L.Rev. 413 (1979).

One court has rejected both the control group and subject matter tests in an attempt to strike "a balance between the privilege's goal of promoting freedom of consultation and full disclosure between an attorney and a seeker of legal services and the law's need for relevant evidence." *In Re Ampicillan Antitrust Litigation*, 81 F.R.D. 377, 387 (D.D.C.1978). The test developed by the court in *Ampicillan* was used without discussion in *S. E. C. v. Texas Internat'l Airlines*, 79–0126 (D.D.C. Aug. 3, 1979). The court in *Ampicillan* gives voice to a concern frequently noted by courts and commentators and shared by this Court. "(T)he privilege must be structured so that a large 'zone of silence' around corporate affairs is not created by allowing corporations to insulate all their activities by discussing them with legal advisors." 81 F.R.D. at 387.

Having reviewed the various approaches taken by other courts, we are of the opinion that, under the facts of this case, the control group test of *Natta v. Hogan*, 392 F.2d 686 (10th Cir. 1968) most effectively meets the concern for creating too large a zone of silence while recognizing a proper scope for the attorney-client privilege. To this end, we find that Mr. Kirchhoff is not a member of the control group and is not thereby insulated from responding to inquiry. The control group includes persons with authority to control or substantially participate in decisions made on the basis of legal advice. Mr. Kirchhoff's

responsibilities were limited to obtaining and assembling information requested by the Legal Department of AT&T. Mr. Kirchhoff had no authority to make or participate in the making of any decisions regarding actions to be taken.

There are several reasons why the Court believes that the *Hogan* test is particularly appropriate under the facts of this case. The Court is very hesitant to approve any corporate action which has the broad effect of extending the privilege to otherwise discoverable material. In this action, Respondents are contending that through a letter from the President of the company, communications from all 40,000 Mountain Bell employees could qualify for the attorney-client privilege. The Court cannot extend the privilege to this extent nor legitimize such an impediment to reasonable and necessary discovery.

Additionally, there is no evidence that the individual employees who were interviewed by the Kirchhoff staff were ever informed that their conversations would be kept confidential. We seriously question whether the individual employees would have the right to claim the attorney-client privilege in this instance. They are not the client; they were directed by their employer to speak to the investigators. If illegal activity were uncovered in an interview, the company could have turned that information over to appropriate officials in spite of employee objections.

■ Further, in order for the attorney-client privilege to apply, communications for which the privilege is claimed must be kept confidential. 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961); *Natta v. Hogan*, 392 F.2d 686, 693 (10th Cir. 1968). The documents gathered in this case were not removed from Mountain Bell files. The documents, which were kept in the normal course of business, were merely copied; the originals can routinely be viewed by Mountain Bell employees. Thus, we question the confidentiality of the documents and the applicability of the privilege to those documents.

Finally, the Court takes note of the degree to which the attorney-client privilege is strained in this case. Mountain Bell asserts the privilege here. But Mountain Bell, although a subsidiary of AT&T, is not a named party in the *Jarvis* case. Mr. Kirchhoff and his staff of non-lawyers conducted investigations with Mountain Bell employees at the request of the AT&T Legal Department. Similar investigatory teams were established throughout the Bell System. The legal department of one of many related companies thus used non-lawyer employees of other related companies to reach employees throughout the entire system. The privilege claimed here could potentially protect thousands of communications because those communications were channeled to the AT&T Legal Department. The attorney-client privilege was never intended to protect so extended a chain of communication.

■ We recognize the serious public policy issues which this matter presents. This Court in no way wants to rule in a fashion which would cause a corporation to hesitate to investigate alleged wrong-doing. However, the Court is even more reluctant to grant a company-wide privilege merely because the corporation has structured itself in such a manner that all information is processed through counsel. We have balanced the conflicting policies involved as represented by the positions of the parties in this case. We are satisfied that strong public policy and the spirit and tenor of the Federal Rules of Civil Procedure mandate the disallowance of the privilege in this case. The claimed exemption is broader than necessary and cannot stand. Accordingly, the Court finds that the attorney-client privilege is not available to respondents on the motion before us.

IV.

■ Respondents also assert that many of the questions certified at Mr. Kirchhoff's deposition involve matters which are privileged under the work product doctrine. That doctrine protects materials prepared in anticipation of litigation by a party or his

attorney or other representative from discovery. Fed.R.Civ.P. 26. However, the privilege is a qualified one. A showing of substantial need for materials coupled with a showing of undue hardship in obtaining the materials elsewhere overcomes the protection of the privilege. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Natta v. Hogan*, 392 F.2d 686, 693 (10th Cir. 1968).

■ An exhaustive analysis of the work product doctrine is unnecessary. The Court assumes, without deciding, that Mountain Bell is entitled to claim the work product privilege as to the matters investigated by Mr. Kirchhoff and his staff in this suit between Jarvis and AT&T. The Court finds that as to some of the certified questions, the movants have made the showing required to support the granting of the motion to compel.

From a review of the complaint, it is readily apparent that some of the materials inquired about are relevant and necessary to the preparation of the movants' case in *Jarvis*. Additionally, the movants have adequately shown that the material is not available to them through any other means of discovery. We take this position in light of the testimony from Mr. Kirchhoff regarding how he conducted his investigations. Even with his knowledge of company procedures and "carte blanche" from the company president, he found it very difficult to ferret out the relevant information. Thus, we question how an outsider could uncover this information through the normal discovery channels. He would lack the cooperation which prevailed with Mr. Kirchhoff. Additionally, witnesses tend to forget matters as time passes. Finally, we question the practicality and reasonableness of forcing movants to depose the 1500 persons Mr. Kirchhoff estimated he contacted.

## V.

Against the foregoing analysis we turn to the questions certified.

■ A. Regarding Mr. Kirchhoff's prior testimony in *Litton Systems, Inc. v. AT&T*, the motion to compel is DENIED. The Court will not become the forum by which counsel can uncover information dealt with in a protective order issued by another court. The court which issued the protective order is best equipped to determine whether such information should be disclosed to the movants. We also question the relevance of some of this information to this action, and note that the respondents have agreed to produce relevant deposition transcripts not covered by protective orders.

■ B. The motion to compel regarding the document organization system in the *United States v. AT&T* suit is DENIED. No showing of substantial need for this information has been made. Again, the Court questions the relevance of this information to the present action.

■ C. As to the substance of presentations made at national meetings between Bell System attorneys and litigation support personnel, the titles of reports distributed at those meetings and the names of the preparers of those reports, the motion to compel is DENIED. Additionally, the motion to compel regarding the substance of a video tape shown on two occasions to Mr. Kirchhoff and his staff is DENIED. We find that the questions dealing with these matters are overbroad in their present form.

■ D. The motion to compel regarding the specific allegations of misconduct which Mr. Kirchhoff was asked to investigate by the AT&T Legal Department is DENIED. Again, we find the question to be overbroad and doubt the relevance of much of the information requested to the present case. The Court notes that the list included 150 incidents which were involved with defense of the *United States* case; the issues in the two cases are not identical.

■ E. Finally, we find that the motion to compel regarding the specific incidents identified by Mr. Kirchhoff is GRANTED. These incidents involved an automobile dealer and an athletic club in Salt Lake City, Utah and a bank in Pueblo, Colorado. These matters are directly rele-

vant to the issues in the *Jarvis* case and necessary to the preparation of the movants' case. As discussed earlier, it would be extremely difficult or impossible for movants to obtain this information through normal discovery channels.

The Court has not reviewed the answers filed by respondents under seal. Because all the answers are contained in the same envelope, respondents are directed to file separately under seal with the Clerk's Office the answers to the questions relating to the specific incidents identified by Mr. Kirchhoff by October 24, 1979. After *in camera* review of the answers, the Court will determine the extent to which those answers will be given to movants.

### VI.

In conclusion, the Court makes the following comments.

The instant discovery matter is properly before the Court and the Court has ruled thereon. However, the Court is concerned with making broadly based discovery rulings in cases which are not pending before it. While this procedure is authorized under the Federal Rules of Civil Procedure, the Court recognizes the difficulties which this procedure can cause in cases of this magnitude. In the instant action, for instance, the Bell System has antitrust advisors in over twenty districts. This situation has the obvious potential of resulting in conflicting rulings. Additionally, proceedings in the main case may be delayed by appeals to the various Circuit Courts.

This Court is of the opinion that where practical counsel should seriously consider filing any additional motions covering broad-based discovery with the court before which *Jarvis* is pending. In this manner, discovery procedures for the case will be established which will be uniform.