In re Bryan GORDON and Betty Gordon, Plaintiffs,

v.

Peter BOYLES and Jacor Broadcasting of Colorado, Inc., a Colorado corporation, Defendants.

Bryan Gordon and Betty Gordon, Plaintiffs–Appellees,

v.

Peter Boyles and Jacor Broadcasting of Colorado, Inc., a Colorado corporation, Defendants–Appellants.

Nos. 99SA369, 99SA85, 99SA86.

Supreme Court of Colorado, En Banc.

Sept. 11, 2000.

Bruno, Bruno & Colin, P.C., Marc F. Colin, Christina M. Habas, R. Stephen Hall, Denver, Colorado, Attorneys for Bryan Gordon and Betty Gordon.

Hall & Evans, L.L.C., Daniel R. Satriana, Jr., Steven M. Gutierrez, Joyce L. Jenkins, Denver, Colorado, Attorneys for Jacor Broadcasting of Colorado, Inc.

William H. Haring, P.C., William H. Haring, Denver, Colorado, Attorney for Christopher Damian Gallegos.

Ken Salazar, Attorney General, Dianne E. Eret, Assistant Attorney General, State Services Section, Denver, Colorado, Attorneys for Honorable Herbert L. Stern, III and the District Court, City and County of Denver.

Faegre & Benson LLP, Thomas B. Kelley, Christopher P. Beall, Denver, Colorado, Baker & Hostetler LLP, James A. Clark, L. Andrew Cooper, Denver, Colorado, Attorneys for Amici Curiae The Denver Post Corporation, The Denver Publishing Company, and The Colorado Press Association.

Hall & Evans, L.L.C., Daniel R. Satriana, Jr., Steven M. Gutierrez, Joyce L. Jenkins, Denver, Colorado, Attorneys for Peter Boyles.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

In these combined original proceedings and appeal, we first address claims asserted under Colorado's statutory newsperson's privilege to resist compelled disclosure of confidential sources. Second, we address a claim invoking Colorado's attorney-client privilege to protect communications between co-defendants in a civil case and their joint counsel.

In this case, one of the defendants, local radio talk show host Peter Boyles, made allegedly defamatory comments about one of

the plaintiffs, police officer Bryan Gordon. Boyles reported that Gordon stabbed another officer in a fight over a woman at a Denver nightclub. With respect to the confidential sources upon whom Boyles relied for his radio broadcasts about Gordon, the trial court ordered Boyles to disclose information about the details provided by the sources, their reliability, and their identities. Boyles steadfastly refused, citing the newsperson's privilege pursuant to section 13–90–119, 5 C.R.S. (1999). As a result of Boyles's refusal to disclose his sources, the trial court held Boyles in contempt.

After Boyles refused to disclose the identities of his sources, the trial court ordered Boyles's employer (Jacor Broadcasting of Colorado, Inc., who is also Boyles's co-defendant in the defamation case) and Boyles's news supervisor (Chris Gallegos, a witness but not a party to the defamation case) to disclose the identities of Boyles's confidential sources. Gallegos and Jacor argue that the trial court's order violated Colorado's statutory newsperson's privilege, which shields them from having to divulge the news information. In addition, Jacor argues that the order compelling it to reveal Boyles's sources violates the attorney-client privilege pursuant to section 13–90–107(1)(b) because Jacor learned the identities of the sources during confidential communications with the attorney that represents both Jacor and Boyles. Boyles, Jacor, and Gallegos each seek review of the trial court orders, arguing that the trial court improperly considered their asserted privileges and wrongfully ordered them to disclose the identities of Boyles's confidential sources.

We hold that the newsperson's privilege in Colorado is a qualified privilege, not an absolute one. We approve the test articulated by the trial court with some modifications. To avoid the operation of this privilege, a trial court must find that the three statutory conditions of section 13–90–119(3)(a) through (c) are satisfied. We hold that in defamation cases where the defendant is a newsperson, the trial court must make a preliminary determination of whether the plaintiff has made a satisfactory showing of the probable falsity of the defendant's allegedly defamatory statements at the time the statements were made. In our view, the proof of probable falsity is an integral part of the balancing test required by the third prong of the newsperson's statutory privilege under section 13–90–119(3) because the First Amendment was not designed to protect the reporting and dissemination of false statements.

With respect to Boyles's appeal in No. 99SA369, we reverse the $5,000 contempt fine imposed on Boyles because the trial court did not make findings pursuant to the newsperson's privilege statute at the time the court ordered Boyles to disclose his source's identities, and we remand this case to the trial court for further proceedings consistent with this opinion.

We make our rule absolute in No. 99SA85 and vacate the trial court's order requiring Gallegos to disclose Boyles's confidential sources. The trial court may order Gallegos to disclose Boyles's sources, but only after reassessing Boyles's assertion of the newsperson's privilege under the standards we articulate in this opinion.

In addition to instructing the trial court to reconsider its orders to Boyles and Gallegos, we make our rule absolute in No. 99SA86, vacating the trial court's order requiring Jacor to disclose Boyles's sources. Because Jacor did not obtain the news information while acting in its capacity as a newsperson, it cannot assert the newsperson's privilege. However, Jacor learned the identities of Boyles's confidential sources only in the context of confidential attorney-client communications with a co-defendant and joint counsel. Because we apply the attorney-client privilege to communications between co-defendants and joint counsel concerning matters of common interest to their joint defense, the privilege applies to Jacor and the trial court's order must be vacated.

## II. FACTS AND PROCEEDINGS BELOW

During the late night and early morning hours of January 31 and February 1, 1997, several people engaged in multiple altercations at Pierre's Supper Club in Denver. At least six off-duty Denver police officers were

present at the club over the course of the night. During one of the fights, someone stabbed Denver Police Officer Ron Thomas, who was then taken to Denver Health Medical Center for treatment of a laceration on his stomach.

In mid-April 1997, Boyles broadcast several reports on his radio talk show about the incident at the nightclub and the stabbing, claiming that officer Bryan Gordon stabbed Thomas in a fight over a woman. Boyles stated that the Denver Police Department covered up the incident because Gordon is the son of a high-ranking police official. Boyles also asserted that Gordon had been charged with domestic violence in the past.

During his broadcasts, Boyles claimed that confidential sources provided him with this information and that his own investigation into the matter confirmed the reports about Gordon. Boyles stated that at least some of his information came from people associated with gangs, that the sources were "no angels," and that they were "borderline gang members who are struggling with some drug problems."

Jacor and Gallegos became aware of the identities of Boyles's confidential sources. At least two of Jacor's employees—Lee Larsen and Kris Olinger—learned the identities of Boyles's sources during meetings with the joint counsel for Boyles and Jacor. Gallegos learned the identities of two of the sources in his capacity as Boyles's supervisor, directly speaking with one of the sources before Boyles's broadcasts. In contrast to Larsen and Olinger, Gallegos learned the identities of the sources directly from Boyles, outside the context of meetings with Boyles's and Jacor's shared counsel.

The Denver Police Department conducted investigations about the events and the way in which the off-duty officers handled the situation at the nightclub. According to the police reports concerning the fight, no witnesses stated that Gordon was at the nightclub when Thomas was stabbed or that Gordon took part in the fight. Although the Department's internal investigation files (IAB files) remain confidential, the trial court found, after thoroughly reviewing the IAB files in camera, that none of the witnesses interviewed in the IAB files said that Gordon was at the scene when Thomas was stabbed.

On August 22, 1997, Bryan and Betty Gordon filed suit against Boyles and Jacor for injuries that allegedly resulted from Boyles's broadcasts about Gordon's involvement in the fight with Thomas and the Police Department's supposed cover-up of the incident. Gordon brought suit for defamation, intentional infliction of emotional distress, false light, and negligent supervision; Betty Gordon filed a claim for loss of consortium.

With respect to the confidential sources upon whom Boyles relied for his broadcasts about Gordon, Gordon sought discovery of details provided by the sources, the bases for Boyles's belief in the reliability of the sources, and the identities of the sources. To obtain this information, Gordon used various discovery tools: interrogatories, requests for admission, and requests for production. Gordon sought this information claiming that it is directly relevant to the issue of what Boyles knew or recklessly disregarded about the truth or falsity of the reports given by his confidential sources.[1] See, e.g., Capuano v. Outlet Co., 579 A.2d 469, 477 (R.I.1990) (noting relevance of confidential source's identity in defamation case).[2]

---

1. Because the issue was not raised before us, we assume without deciding that Gordon is either a "public official" or a "public figure" for the purposes of his defamation action against Boyles. Cf. St. Amant v. Thompson, 390 U.S. 727, 730 & n. 2, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (accepting for the purposes of that case the Louisiana Supreme Court's conclusion that a deputy sheriff is a public official for defamation purposes); DiLeo v. Koltnow, 200 Colo. 119, 124–25, 613 P.2d 318, 322 (1980) (concluding that police officer was a public figure in defamation context in part because the officer "effectively cast himself and his views into public controversy"). As

such, Gordon must establish that Boyles acted with "actual malice" or a "reckless disregard" of the truth or falsity of his statements about Gordon to establish Boyles's liability for defamation. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 153, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); New York Times Co. v. Sullivan, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

2. See also Phillip Morris Cos. Inc. v. ABC Inc., No. LX–816–3, 23 Media L. Rptr. 1434, 1438 (Va.Cir.Ct. Jan. 26, 1995) ("The information about the confidential sources is clearly relevant

Boyles provided only partial answers to many of Gordon's interrogatories and requests, and refused to answer other questions, claiming protection under section 13–90–119(2), which shields a newsperson from being questioned about news information in official proceedings except under certain circumstances. Boyles refused to disclose the details told to him by his sources before his radio broadcasts, the bases for the source's reliability, or their identities, and he refused to state whether he had spoken to any Denver police officers about the incident before he aired his reports.

After Boyles's initial responses and refusals to disclose information about his sources, Gordon sought to compel the defendants to respond to the discovery requests "more particularly" and to provide "any and all information sought with respect to the identity of Defendant's ... 'reliable sources.'" Gordon also asked the court to compel the defendants to respond with greater detail to other interrogatories relating to Boyles's reports about the fight in which Thomas was stabbed.

On August 29, 1998, the trial court held a hearing to discuss Gordon's motion to compel and ordered Boyles to disclose additional and particular information about his sources. The court considered Boyles's claim of newsperson's privilege and heard testimony that Gordon needed information about Boyles's sources in order to establish whether Boyles knew the reports were false or acted with reckless disregard as to their truth or falsity. The court also heard testimony that Gordon attempted unsuccessfully to learn the identities of the sources by interviewing eyewitnesses at the scene and talking to other reporters who Boyles claimed might have information about his sources or reports.[3]

The court concluded that although Boyles did not necessarily have to disclose the identities of his sources, he had to provide more detailed information about his sources and their reliability than he had in his initial responses to discovery and his initial voluntary disclosures. The court stated that Gordon needed the information about Boyles's sources to prove the case against him:

> And the bottom line, Mr. Satriana [Boyles's attorney], is that there's no way this case can go forward without the Defendants identifying, perhaps not all of their sources, but a good deal of what they did to investigate and then verify the truth and accuracy of the disputed statements, and we're going to get to the bottom of this case.

The court did not state that Boyles's privilege had been completely overcome, only that Boyles had to provide Gordon with more detailed information than his initial discovery responses:

> I'm not saying, Mr. Satriana, that you have to disgorge everything, but you've got to do a lot more than you've done here.

Following this order, Boyles petitioned this court for a rule to show cause why the trial court's order should not be vacated. We denied Boyles's petition.

At a hearing the week after we denied Boyles's first petition, Boyles reiterated his argument that the newsperson's privilege protected him from having to disclose any information about his sources, and he sought clarification from the court about what information the court expected Boyles to supply to Gordon. The court directed Boyles to comply "fully and completely" with Gordon's interrogatories and requests, meaning that he had to supply the names of the sources and other specific information as requested by Gordon:

> Mr. Satriana: Your Honor, may I ask a question?
>
> The Court: Sure.

to the issue of 'actual malice.' "), *vacated on other grounds,* No. LX–816–3, 23 Media L. Rptr. 2438 (Va.Cir.Ct. July 11, 1995).

3. For example, Gordon told the court that he contacted two reporters from a local newspaper who appeared on Boyles's show discussing the nightclub incident. Gordon stated that neither of those reporters was willing to disclose their sources of information about the incident, asserting the newsperson's privilege. Gordon also stated that because Boyles's sources were not eyewitnesses, direct evidence such as police reports or the IAB files about the incident do not provide Gordon any insight into the possible details about or identities of Boyles's sources.

Mr. Satriana: Given the fact that the Court has said that we have to fully and completely respond to Interrogatory No. 3 that asks that we identify, which I believe has been defined as by name and by other identification, I just want to make sure that I understand the Court. When you say "fully and completely respond," you're saying we actually have to name names in order to comply with Interrogatory No. 3 fully and completely.

The Court: Right.

Thus, although the trial court initially ordered Boyles to supplement his responses to Gordon with more specific information about the bases for his reports and his sources, the court clarified that order by requiring that Boyles also provide the names of his sources.

In response to the court's oral and written orders to disclose the names of his sources, Boyles tendered supplementary responses that partially identified three different individuals from whom Boyles received information concerning the fight and the stabbing of officer Thomas. Boyles stated that Source 1 had information about a fight at the nightclub in which two officers fought over a woman, one officer stabbed the other, and a weapon belonging to one of the participants was lost. Source 2 said that the information Boyles received from Source 1 was true and named Gordon and Thomas as the officers allegedly involved in the fight. Source 3 told Boyles that he had heard portions of the information Sources 1 and 2 told Boyles, and Boyles stated that Source 3 supplied Boyles with "documentary evidence" relating to the fight at the nightclub. Source 3 also told Boyles that Gordon faced allegations of domestic abuse and that Gordon's mother saved his job by virtue of her influence in the department.

Boyles claimed that he assessed the reliability of Sources 2 and 3 based on their positions, their reliability on past occasions, and the similarity of the information they provided. Boyles also claimed that the discussions he had on his radio program with Denver City Councilman Ed Thomas, Denver Police Spokesperson John Wycoff, local paper editor Patty Calhoun, and reporter Karen Bowers provided information that confirmed the reliability of the information Boyles received from his confidential sources.

Boyles refused to divulge the names or other specific information about his sources, once again asserting his newsperson's privilege. In response to Boyles's continued refusal to abide by the court's order and for his consistently truncated and incomplete responses, Gordon requested that the court impose sanctions on Boyles. In addition to Boyles's refusal to follow the court's order to disclose information about his sources, the court recognized a second basis upon which to hold Boyles in contempt and impose sanctions: Boyles's failure to provide adequate responses to the Gordons' interrogatories for reasons other than the newsperson's privilege.

At a later hearing to determine the appropriate sanctions for Boyles's conduct, the court made specific findings about Boyles's conduct with respect to sanctions pursuant to C.R.C.P. 37 [4] and to contempt sanctions under C.R.C.P. 107.[5] At this hearing, Boyles waived any procedural objections to the contempt proceedings and conceded that the sole issue to be resolved at the hearing was that of the appropriate sanctions for his conduct, which he argued was based solely upon his assertion of the newsperson's privilege. The court heard extensive oral argument from both parties and questioned Boyles directly about his responses to the interrogatories and his confidential sources. In an oral order later supplemented by two written orders, the court held Boyles in contempt for both his failure to disclose his sources pursuant to the court's order and for Boyles's

---

**4.** C.R.C.P. 37 allows a court to impose sanctions on a party for failing to respond to discovery requests. *See Todd v. Bear Valley Apartments,* 980 P.2d 973, 977 (Colo.1999). For purposes of Rule 37, "an evasive or incomplete disclosure, answer, or response shall be deemed a failure to disclose, answer, or respond." C.R.C.P. 37(a)(3).

**5.** Pursuant to C.R.C.P. 107, a court may impose sanctions when it concludes that a person has committed disorderly or disruptive behavior, including "conduct that unreasonably interrupts the due course of judicial proceedings" and "behavior that obstructs the administration of justice."

obfuscation of the discovery process with regard to matters other than the disclosure of the identities of his sources.

The court noted that it respected Boyles's belief in his right to claim the newsperson's privilege, but the court concluded that Boyles had the present ability to comply with the court's order to disclose and his refusal to do so constituted contempt of the court:

> I have no doubt that Mr. Boyles has a heartfelt, strongly-held view that he must protect his sources. And I respect that view in this situation. I don't agree that those sources should be protected in light of my ruling, but I understand and respect his position on the matter. Nevertheless, he has the present ability to comply with this order to divulge these sources and has chosen not to.
>
> . . . .
>
> So it's my view that I am frankly only moderately bothered by your refusal to obey my order vis a vis the disclosure of sources, because I respect your view on that.

6. For example, the court questioned Boyles at length about why he had not disclosed the identity of a Denver police officer with whom Boyles spoke about the fight. Although Boyles did not claim that the officer was one of his confidential sources or that the information about the officer was otherwise privileged, he had not disclosed the information to Gordon:

 > The Court: But while we're talking about this female Denver police lieutenant from the IAB, why has she not been identified?
 > Mr. Boyles: I don't know her last name, Your Honor. I wrote it down at the time [when I spoke with her on the phone].
 > The Court: Well, you just told me that you could find it.
 > Mr. Boyles: Yeah.... On my word, I was contacted by internal affairs, a woman police lieutenant....
 > The Court: I understand all of that. What I'm driving at is simply this. You can correct me if I'm wrong, Mr. Satriana or Mr. Colin, but I rather expect that somewhere in these discovery requests you've asked for the names of people that provide information. Assuming that to be true, why haven't you [Boyles] given the plaintiffs the name of this female police lieutenant? Now, I understand you can't remember, but you've also told me that you got it in your notes somewhere. The very purpose of discovery is you go to your notes, you find out what you've got, and you give it to the other side.

Pursuant to C.R.C.P. 107, the court fined Boyles $5,000 for his refusal to disclose the identities of his sources despite the court's order that he do so.

The court also sanctioned Boyles for his "unwarranted, unjustified, and persistent efforts to hinder and delay" Gordon's efforts to pursue his claims against Boyles. After a direct exchange with Boyles about his responses to Gordon's interrogatories, the court was "satisfied beyond a reasonable doubt" that Boyles deliberately hindered Gordon's attempts to discover non-privileged information from Boyles by providing misleading, evasive, and arguably false responses to Gordon.[6] For his failure to be responsive throughout the discovery process, the court fined Boyles $15,000 pursuant to C.R.C.P. 107.[7] Pursuant to C.R.C.P. 107(f), Boyles appealed the trial court's conclusion that he could not assert the newsperson's privilege to refuse to disclose his sources. He also appealed the court's subsequent decision to hold him in contempt for his refusal to follow the court's disclosure order.[8]

> Mr. Boyles: I've never been deposed, Your Honor.
> The Court: Mr. Colin, have you asked for the name of this person?
> Mr. Colin [Gordon's attorney]: Specifically? Interrogatory number 3 says to name each and every source relied upon for any statements made in The Peter Boyles Show.

7. The court also entered a partial directed verdict in the defamation claim against Boyles on the element of Boyles's actual knowledge or reckless disregard for the truth of his statements about Gordon. *See* CJI–Civ. 4th 22:2 (1998) (including as an element of a defamation action brought by a public figure or public official that the plaintiff must establish, "[a]t the time of publication, the defendant knew that the statement was false or the statement was made with reckless disregard as to whether it was false or not"). In addition to the partial directed verdict, the court ordered Boyles to pay the plaintiffs' attorneys' fees.

8. Because Boyles appealed only the issue of whether the trial court erred in concluding that he could not assert the newsperson's privilege to protect his sources, we do not address the $15,000 fine the trial court imposed for Boyles's evasive and misleading responses to the plaintiff's initial interrogatories and requests for admission. Further, we do not address the trial court's Rule 37 sanctions of a partial directed

Following the trial court's finding of contempt and sanctions against Boyles, Gordon sought discovery from Jacor and Gallegos, requesting that each of them provide the identities of Boyles's sources. Jacor objected to this discovery on the grounds that this news information was privileged from disclosure under the newsperson's privilege. Additionally, Jacor argued that it learned the identities of Boyles's sources in the course of attorney-client privileged communications among Boyles, employees of Jacor, and their joint attorney. Gallegos objected to similar requests, claiming the newsperson's privilege.

In response to Gordon's motion to compel answers from both Jacor and Gallegos, the trial court issued a detailed written order, requiring Jacor and Gallegos to disclose the identities of the sources. The court's order to Jacor and Gallegos was focused on the issues of both the attorney-client privilege[9] (asserted by Jacor) and the newsperson's privilege (asserted by Jacor and Gallegos). Because the trial court .concluded that the identities of the sources were "facts" and not "communications," it determined that Jacor could not claim that the attorney-client privilege protected it from having to disclose the identities of Boyles's sources. *See National Farmers Union Property & Cas. Co. v. District Court*, 718 P.2d 1044, 1049 n. 3 (Colo. 1986) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 396, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).

After concluding that Jacor could not rely on the attorney-client privilege to withhold the identities of Boyles's sources, the court addressed Jacor's and Gallegos's assertions of the newsperson's privilege. Examining in close detail cases addressing the First Amendment issues relevant to a defamation proceeding against a media defendant, the court concluded that the information Gordon sought was not privileged because Gordon established that Boyles's statements were "provable as false." By this test, the court focused on the strength of the plaintiffs' evidence and claims that the allegedly defamatory statements were false, relying on the notion that false statements receive minimal protection under the First Amendment. *See Herbert v. Lando*, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). The court found that no eyewitnesses in either the police reports to the stabbing or the confidential IAB files from the police department's investigation placed Gordon at the nightclub when Thomas was stabbed, much less named Gordon as Thomas's assailant. Further, the court found that Boyles presented no evidence other than his confidential sources to implicate Gordon in the stabbing. Because Gordon established the likely falsity of Boyles's reports, the court was convinced that information Jacor and Gallegos sought to withhold would "lead to persuasive evidence on the issue of malice" (quoting *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir.1972)).

Having determined that Boyles's statements were "provable as false," the court assessed all three factors for overcoming the protection of the newsperson's privilege as required by section 13–90–119(3). The court concluded that the identities of the sources were directly relevant to a substantial issue in the case because they were the only sources upon which Boyles relied and their statements were the only evidence of Boyles's state of mind with regard to the truth or falsity of the sources and his reports. *See Phillip Morris Cos.*, 23 Media L. Rptr. at 1438–39. The court also found that Gordon could not otherwise obtain the information because Gordon made every reasonable effort to discover Boyles's sources from other Jacor employees and from other reporters that Boyles claimed might have such information.

Lastly, the court concluded that Gordon's interest in pursuing the suit against Boyles outweighed the First Amendment interests

verdict and attorney's fees because those issues are not properly before us.

**9.** Pursuant to section 13–90–107(1)(b), communications between an attorney and a client are privileged from disclosure:

An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment.

of Jacor and Gallegos. The court noted that Gordon's interest in his reputation is very strong. *See Herbert*, 441 U.S. at 169, 99 S.Ct. 1635. The trial court stated that the heightened standard of "actual malice" under *New York Times v. Sullivan* adequately protected Boyles's First Amendment interests. *See* 376 U.S. at 279–80, 84 S.Ct. 710. The court further noted that the public's interest in receiving news information favored disclosure of the sources because false statements do not further any legitimate public interest. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Following the trial court's order requiring them to disclose information about Boyles's sources, Gallegos and Jacor both petitioned this court pursuant to C.A.R. 21 for a rule to show cause why the trial court's order should not be vacated, and we issued the rule. After hearing oral arguments on these petitions, we transferred Boyles's appeal from the court of appeals to this court in order to dispose simultaneously of the closely related issues presented by Gallegos, Jacor, and Boyles. *See* § 13–4–109(3), 5 C.R.S. (1999).

The petitioners raise two substantive issues that we discuss and resolve separately. First, to address the claims of newsperson's privilege by Boyles, Gallegos, and Jacor, we interpret the newsperson's privilege to resist compelled disclosure of news information, pursuant to section 13–90–119. Second, we consider Jacor's claim that the attorney-client privilege under section 13–90–107(1)(b) protects it from compelled disclosure of the identities of Boyles's sources.

## III. NEWSPERSON'S PRIVILEGE

Boyles, Gallegos, and Jacor each contend that they cannot be compelled to disclose Boyles's sources because, in their view, section 13–90–119 establishes an absolute privilege for newspersons that prohibits compelled disclosure of news information. They argue that the trial court erroneously interpreted the statute by assessing the strength of the evidence presented by Gordon to determine whether Boyles's statements were provable as false before making the three-part inquiry under section 13–90–119(3) to

overcome the newsperson's privilege. They also argue that the trial court improperly assessed the factors listed in section 13–90–119(3) when it concluded that the newsperson's privilege did not protect Boyles, Gallegos, and Jacor from having to disclose Boyles's sources. We disagree.

■ With some modifications in terminology and application, we agree with and adopt the trial court's test for assessing a plaintiff's interest in compelling a newsperson defendant in a defamation case to disclose confidential information. The test, which is not directly required by the statute, protects media defendants in defamation cases because the court may not compel disclosure if the evidence presented by both parties fails to convince the court of the probable falsity of the defendant's statements. Hence, pursuant to section 13–90–119, a newsperson will not be compelled to reveal news information or be sanctioned for refusing to do so unless the court is satisfied, based on the evidence produced at the hearing, that the three factors listed in section 13–90–119(3) have been established, including a determination that the evidence available at the time of the allegedly defamatory broadcasts demonstrates the probable falsity of the newsperson defendant's statements.

### A. First Amendment Context of the Newsperson's Privilege

We begin our analysis with a review of the First Amendment concerns that favor allowing newspersons to withhold confidential news information even though the information is directly relevant to official proceedings. Although he dissented from the Court's holding in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) Justice Stewart aptly described the importance of promoting an unfettered press as a central component of our democracy:

> Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised, and a free press is thus indispensable to a free society. Not only does the press enhance personal self-fulfillment by providing people with the widest possible range of fact and opinion,

but it also is an incontestable precondition of self-government.... As private and public aggregations of power burgeon in size and the pressures for conformity necessarily mount, there is obviously a continuing need for an independent press to disseminate a robust variety of information and opinion through reportage, investigation, and criticism, if we are to preserve our constitutional tradition of maximizing freedom of choice by encouraging diversity of expression.

408 U.S. 665, 726–27, 92 S.Ct. 2646 (1972) (Stewart, J., dissenting) (footnotes omitted). Also as Justice Stewart recognized, the ability of the press to gather information by promising to keep the identities of their sources confidential is a crucial tool for the media:

No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised....

The right to gather news implies, in turn, a right to a confidential relationship between a reporter and his source. This proposition follows as a matter of simple logic once three factual predicates are recognized: (1) newsmen require informants to gather news; (2) confidentiality—the promise or understanding that names or certain aspects of communications will be kept off the record—is essential to the creation and maintenance of a news-gathering relationship with informants; and (3) an unbridled subpoena power [to require the disclosure of confidential information] will either deter sources from divulging information or deter reporters from gathering and publishing information.

Id. at 728, 92 S.Ct. 2646.

Despite Justice Stewart's recognition of the important role of the press in our society and the usefulness of confidential sources in fulfilling that role, the Court majority determined that the First Amendment does not protect members of the press from having to disclose confidential news information at official proceedings. See id. at 690, 92 S.Ct. 2646. Even though the Court determined that there is no First Amendment privilege for newspersons, it noted that Congress and the states are free to fashion such a privilege if they so choose:

At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate. There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.

Id. at 706, 92 S.Ct. 2646.

In a concurring opinion, Justice Powell emphasized that newspersons should be forced to disclose news information only after a court makes a decision based on the particular facts of each case. He suggested that courts should be reluctant to compel disclosure from newspersons, thereby infringing on the operation of the press. Justice Powell stated that before a newsperson should be required to disclose confidential information, a court should determine on a case-by-case basis whether the information is directly relevant and whether the First Amendment interests of the press outweigh the obligation of all citizens to provide relevant testimony in official proceedings. See id. at 710, 92 S.Ct. 2646 (Powell, J., concurring).

B. Colorado's Newsperson's Privilege

Having discussed the First Amendment interests implicated when a newsperson is compelled to disclose confidential news information, we turn to Colorado's statutory newsperson's privilege. In 1990, the General Assembly enacted a statute establishing a privilege for newspersons, essentially codifying Justice Powell's balancing test. See ch.

186, sec. 1, § 13–90–119, 1990 Colo. Sess. Laws 1262, 1262–64.[10] Section 13–90–119(2) provides members of the mass media a privilege shielding them from having to provide testimony and from being questioned about news information [11] that the person learned while acting in a newsperson's capacity: [12]

> Notwithstanding any other provision of law to the contrary and except as provided in subsection (3) of this section, no newsperson shall, without such newsperson's express consent, be compelled to disclose, be examined concerning refusal to disclose, be subjected to any legal presumption of any kind, or be cited, held in contempt, punished, or subjected to any sanction in any judicial proceedings for refusal to disclose any news information received, observed, procured, processed, prepared, written, or edited by a newsperson, while acting in the capacity of a newsperson.

Thus, consistent with the values of a free press and the usefulness of confidential sources, Colorado's General Assembly established a statutory privilege for newspersons allowing them to withhold news information sought in official proceedings.

This privilege, however, is not absolute. Subsection 119(3) explains the conditions under which a newsperson can be compelled to disclose news information. Under this section, a court may compel a newsperson to disclose information if the party seeking the information can demonstrate:

> (a) That the news information is directly relevant to a substantial issue involved in the proceeding;
>
> (b) That the news information cannot be obtained by any other reasonable means; and
>
> (c) That a strong interest of the party seeking to subpoena the newsperson outweighs the interests under the First Amendment to the United States constitution of such newsperson in not responding to a subpoena and of the general public in receiving news information.

§ 13–90–119(3)(a)-(c); [13] see also Henderson v. People, 879 P.2d 383, 393 (Colo.1994) (find-

---

**10.** We note that the General Assembly's intent to protect the press in a manner consistent with the views expressed by members of the Supreme Court in *Branzburg* can be inferred from part of another statute that creates a nearly identical privilege for newspersons, the "Governmental Access To News Information" Act. *See* §§ 24–72.5–101 to –106, 7 C.R.S. (1999). The General Assembly enacted that act at the same time it adopted the newsperson's privilege statute. The act provides newspersons a privilege from having to disclose news information to the government or to governmental entities that is nearly identical to and subject to the same exceptions as the newsperson's privilege under section 13–90–119. *See* § 24–72.5–103. The legislative declaration of section 24–72.5–101 states:

> The general assembly finds that an informed citizenry, which results from the free flow of information between citizens and the mass media, and the preservation of news information sources for the mass media is of vital concern to all people of the state of Colorado and that the interest of the state in such area is so great that the state shall retain jurisdiction over the use of any subpoena power ... to obtain news information or the identification of the source of such information within the knowledge or possession of newspersons, which is hereby declared to be a matter of statewide concern.

While this declaration applies to a statute wholly separate from the newsperson's privilege at issue in this case, the declaration identifies the General Assembly's intent to protect the vital functions of the mass media and the ability of members of the press to resist compelled disclosure of their confidential sources of news information.

**11.** Section 13–90–119(1)(b) defines news information as "any knowledge, observation, notes, documents, photographs, films, recordings, videotapes, audiotapes, and reports, and the contents and sources thereof, obtained by a newsperson while engaged as such, regardless of whether such items have been provided to or obtained by such newsperson in confidence."

**12.** Section 13–90–119(1)(c) defines a newsperson as "any member of the mass media and any employee or independent contractor of a member of the mass media who is engaged to gather, receive, observe, process, prepare, write, or edit news information for dissemination to the public through the mass media."

**13.** Boyles argues that a court may order disclosure of news information only after the party seeking disclosure subpoenas the newsperson. *See* § 13–90–119(3) ("any party to a proceeding ... *may subpoena* a newsperson in order to obtain news information") (emphasis added). We do not read this requirement to require a subpoena when the newsperson is a party to the case. "A subpoena is not necessary during discovery to take a deposition of a party" or otherwise seek production from a party—subpoenas are used to compel testimony or document pro-

ing that newsperson's privilege was not overcome because information sought could be obtained through other reasonable means). These conditions on a newsperson's privilege reflect the strong First Amendment interests of the press and the balancing test Justice Powell suggested to weigh the interests of the media against those of the party seeking confidential news information. Thus, under section 13–90–119, a newsperson has a qualified privilege from disclosing news information obtained in her capacity as a newsperson, but that privilege may be overcome if, based on the trial court's determination, the party seeking the information satisfies the three factors listed in subsection 119(3).

The first of the three conditions is that the news information sought must be relevant to a substantial issue involved in the proceeding. *See* § 13–90–119(3)(a). In some cases, the confidential information may be the only evidence of a crucial aspect of the case, while in other situations, the information may be only marginally relevant to a less significant issue. For instance, in a media defamation case the information about the reliability of the declarant's sources may be relevant to the significant issue of the reporter's state of mind about the truth or falsity of his broadcasts. The less credible the sources, the more likely the declarant acted with malice or a reckless disregard of the truth by broadcasting the information they provided. Hence, the identities of these persons and what they said reflects directly on the declarant's state of mind with respect to the truth or falsity about the information he broadcast. *See Phillip Morris Cos.*, 23 Media L. Rptr. at 1438–39.

Alternatively, even if there exists sufficient proof of actual malice, the identities of the declarant's sources may be relevant for the plaintiff to prove, for instance, that the state-

ment was false or to overcome the affirmative defense of truth. *See Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1341 (Colo. 1988) (recognizing truth as an affirmative defense to an allegation of defamation). In some cases, disclosure of the source may be relevant to prove that the source did not exist. Each case must rest on its own unique facts. When the news information sought bears so directly on substantial elements of a plaintiff's claims, the court may determine that section 13–90–119(3)(a) is satisfied.

■ The second factor that a court must consider before compelling a newsperson to disclose information is whether the information is obtainable through other reasonable means. *See* § 13–90–119(3)(b). The burden is on the party seeking the information to demonstrate to the court both that no other reasonably available sources of the information exist and that the party has exhausted the reasonably available sources that might provide the information sought. *See Bauer v. Gannett Co.*, 557 N.W.2d 608, 612 (Minn. Ct.App.1997). Further, the party seeking disclosure must demonstrate that it has made "substantial efforts" to obtain the information from other sources; bald assertions that the information cannot be obtained through alternative sources cannot sustain a court's order requiring disclosure by a newsperson asserting the privilege. *See id.*; *see also Zerilli v. Smith*, 656 F.2d 705, 714 & n. 50 (D.C.Cir.1981) (noting that in some circumstances a court may require a party to depose as many as sixty people before concluding that the party has exhausted reasonably available alternative sources of confidential information).

In cases where the information itself is the subject of the plaintiff's inquiry, a court must consider whether the plaintiff has exhausted available avenues from which the information

duction from non-party witnesses with relevant information. *See* 9 James Wm. Moore et al., *Moore's Federal Practice* § 45.02 (3d ed.1997). During the discovery process, a subpoena is not required for a party seeking to depose or receive responses to interrogatories, requests for production, or requests for admission from another party. *See* C.R.C.P. 30, 31, 33, 34, 36. If a party refuses to answer a deposition question, an interrogatory, or production request on the basis of a

claimed privilege, the court may evaluate the asserted privilege and determine whether the party must respond. *See, e.g., Hawkins v. District Court*, 638 P.2d 1372, 1374–75 (Colo.1982). Thus, the subpoena requirement of section 13–90–119(3) is redundant when the newsperson is a party to the case, and we will not require the party seeking news information to subpoena the newsperson-party before the court may assess the newsperson's asserted privilege.

could be obtained. For example, in *Henderson*, we held that the newsperson's privilege protected the newsperson from compelled disclosure because the plaintiff had not sought information about a helicopter's flight path from public aviation authorities and because other witnesses had provided the information sought. *See* 879 P.2d at 393.

In other situations, however, there may be no reasonable alternative means of obtaining the information sought. For instance, the identities of and information revealed by confidential sources often cannot be obtained by means other than disclosure by the newsperson because the plaintiffs cannot find anyone who both knows and is willing to disclose information about the confidential sources. *See Phillip Morris Cos.*, 23 Media L. Rptr. at 1439. Thus, before compelling disclosure of confidential news information, a court must determine that no other sources of specific information directly relevant to an official proceeding exist.

In cases where a party seeks news information related indirectly to an issue in the case and the specific information sought is not itself central, the court should consider whether there are other sources of the information being sought. For example, a plaintiff in a defamation case may be able to establish the actual malice of the declarant with information other than the identity of source on which the declarant relied, such as testimonial or documentary evidence of the declarant's state of mind. In other words, even though the specific information sought may not be available through other means (e.g., the names of and information revealed by confidential sources), the information that is truly relevant to the defendant's claims (e.g., the actual malice of the newsperson) may be available through other evidence. *See Dangerfield v. Star Editorial, Inc.*, 817 F.Supp. 833, 838 (C.D.Cal.1993). In such instances, the court will not compel disclosure.

As the third consideration for compelling disclosure under section 13–90–119(3), the court must weigh the interests of the party seeking the information against the First Amendment interests of the newsperson in withholding it and the public's interest in promoting the gathering and reporting of news. This balancing test requires the court to consider the First Amendment values Justice Stewart eloquently set forth in *Branzburg*. The newsperson's privilege should give way only under circumstances where the party seeking the information has a truly significant interest at stake, such as the interest that defamation plaintiffs have in protecting their reputations. *See Herbert*, 441 U.S. at 169, 99 S.Ct. 1635 (recognizing that a person's reputation is a "basic concern").

As part of the balancing test required under section 13–90–119(3)(c), the court must consider the nature of the claim at issue. For example, "[w]hen the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." *Zerilli*, 656 F.2d at 714. On the other hand, when the newsperson is not a party and is merely a source of information for one party in a lawsuit, the newsperson's state of mind is not at issue in the case and the equities weigh in favor of respecting the privilege.

In addition to its exposition of these three factors under section 13–90–119(3), the district court considered the evidence presented by both parties to determine whether Gordon had shown that Boyles's statements were "provable as false." Essentially, the court asked whether Gordon presented sufficient evidence to conclude that Boyles's statements were more likely than not false. The court made this assessment because false speech does not contribute to the values protected by the First Amendment and thus receives minimal protection. *See Gertz*, 418 U.S. at 340, 94 S.Ct. 2997 ("[T]here is no constitutional value in false statements of fact"). The reasoning of the trial court was that if, based on the evidence presented it appeared that Boyles's comments were probably false, then the First Amendment interests in protecting Boyles's sources were substantially less than if it appeared at least somewhat likely that Boyles's statements were true.

As part of its analysis, the court took into account the fact that no eyewitnesses placed

Gordon at the nightclub when Thomas was stabbed or claimed that Gordon stabbed Thomas. Further, the court found that Boyles presented no evidence that Gordon was even present at the scene when Thomas was stabbed and that Boyles relied upon no evidence other than unsupported hearsay statements that Gordon stabbed Thomas. Thus, because false speech receives little First Amendment protection, and because evidence available at the time of the broadcasts indicated that Boyles's radio broadcast statements were probably false, the court concluded that Gordon's interests in obtaining the information outweighed the First Amendment interests at stake.

■ Although we do not adopt the trial court's terminology, we agree with its approach to assessing the interests of both parties under section 13–90–119(3)(c). We hold that, as part of the balancing test required by that section, the trial court must weigh the evidence presented at the pretrial hearing to determine whether the newsperson's statements were probably false.[14] If a newsperson defendant in a defamation case can provide evidence that a confidential source's information was at least probably truthful, then the court should favor nondisclosure. For example, in *Southwell v. Southern Poverty Law Center*, 949 F.Supp. 1303 (W.D.Mich. 1996) the court refused to compel disclosure of confidential sources because it was convinced that the defendant provided sufficient evidence to support a "reasonable reliance" on the confidential source. 949 F.Supp. 1303, 1307–08 (W.D.Mich.1996). The defendant in *Southwell* produced notes from a conversation with the source that included specific details, such as the names of persons present at a meeting

being described by the source, the license plate number of a car driven by one of those present at the meeting, and the nature of the conversation at the meeting. *See id.* Because the defendant produced sufficient evidence of the reliability and probable truthfulness of the source's information, the court did not compel disclosure. *See id.* at 1307.

■ We note, as did the court in *Southwell,* that a court should weigh the evidence known to the defendant about his source's information *at the time* that the defendant published the defamatory statement. *See id.* at 1309. That is, proving that a source's information was false after publication does not establish that the defendant knew or should have known the information was false. *See id.* If the newsperson defendant can demonstrate that there was a reasonable basis to believe that a source's information was true at the time it was reported, then the court should favor protecting the source. By doing so, the court will not dissuade reporters from relying on sources they believe are reliable because such discouragement would run counter to the interests protected by the First Amendment.

By contrast, when a defendant produces little or no evidence to support his reliance on the source and the plaintiff demonstrates that the source's information was probably false, the court should favor compelling disclosure. In such instances, the First Amendment interests at stake are probably minimal because false statements of fact receive little protection and the First Amendment was not designed to foster the reporting and dissemination of false facts. Thus, if the trial court is convinced that a newsperson had only an insubstantial basis (or no basis at all) to

14. Although we agree with and adopt the trial court's approach to the balancing test required under section 13–90–119(3)(c), we do not employ the "provable as false" language that it derived from *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). *See also id.* at 23–24, 110 S.Ct. 2695 (Brennan, J., dissenting). In *Milkovich*, the U.S. Supreme Court distinguished between statements of opinion, which are not actionable in defamation, and statements of fact (i.e., those statements that are "provable as false"), which may be the subject of defamation claims. *See id.* at 16–21, 110 S.Ct. 2695; *see also In re Green*, 11 P.3d 1078, 1084

(Colo. 2000) ("[A] crucial distinction exists between false statements of fact which receive no constitutional protection in defamation cases and ideas or opinions which by definition can never be false so as to constitute false statements which are unprotected." (quoting *Bucher v. Roberts*, 198 Colo. 1, 3, 595 P.2d 239, 241 (1979)). Because we do not wish to confuse the concept of statements of fact (versus statements of opinion) with the notion of weighing the probable falsity of a declarant's statements, rather than using the term "provable as false" as did the trial court, we instead use the terms "probably false" and "probable falsity."

believe in the truthfulness of the source's information, then the First Amendment interests at stake are probably minimal and compelling disclosure may be appropriate. *See Herbert,* 441 U.S. at 171, 99 S.Ct. 1635; *Cervantes,* 464 F.2d at 994.

By weighing the relative strength of the evidence presented as to the likely falsity of the defendant's statements, the trial court ensures that newspersons will not be forced to disclose confidential sources based on unsubstantiated claims of injury resulting from alleged falsehoods. *See Dallas Morning News Co. v. Garcia,* 822 S.W.2d 675, 681 (Tex.App.—San Antonio 1991), writ conditionally granted. The court does not have to be convinced that the statement is actually false; rather, the court must believe that, based on the evidence presented at the pretrial hearing, the statement is probably false.[15] Thus, if the plaintiff fails to convince a court of the probable falsity of allegedly defamatory remarks, or the newsperson defendant in a defamation action produces sufficient evidence to persuade the court that the statements were true, then the court will not compel disclosure.

In sum, the General Assembly adopted section 13–90–119 in order to protect the First Amendment interests of newspersons who rely on confidential sources of information to gather and report news about public affairs. However, the privilege is qualified, not absolute. A court must carefully weigh each of the three factors listed in section 13–90–119(3)(a)-(c) before compelling disclosure. As part of the balancing test required under section 13–90–119(3)(c) to weigh the First Amendment interests of a newsperson defendant in resisting compelled disclosure of confidential sources and the plaintiff's interest in the information, the trial court must make a preliminary determination about the probable falsity of the defendant's statements. While in some instances disclosure may be the best option, we emphasize that when deciding whether to compel a newsperson to disclose confidential information, a trial court should compel disclosure only as a last resort when necessary to promote the effective administration of justice.

### C. Application to Parties

The trial court's written order, requiring Jacor and Gallegos to disclose Boyles's sources, thoroughly addressed each of the statutory factors that section 13–90–119(3) lists as considerations for requiring a newsperson to divulge confidential information. Additionally, the court's "provable as false" test, which we adopt in modified form as a "probably false" standard today, provides another level of protection for newspersons asserting the privilege.

■ However, because the trial court failed to make adequate findings under section 13–90–119(3) concerning Boyles's claim of privilege at the time it ordered disclosure of the identities of Boyles's sources, we are unable to affirm the contempt sanction imposed on Boyles for his refusal to follow the trial court's disclosure order. The thorough written order of the trial court concerning the newsperson's statutory privilege was issued after it ordered Boyles to disclose his sources and after it held Boyles in contempt for failing to do so.[16] This written order was directed to defendant Jacor and non-party witness Gallegos, but not to Boyles. If, on remand, the court issues appropriate findings with regard to Boyles's assertion of the privilege and the court, consistent with this opinion, determines that section 13–90–119(2) does not shield Boyles from having to disclose the sources, it may then order disclosure. If Boyles continues to defy the court, the court may then consider appropriate sanctions.

---

15. We join several other jurisdictions that have adopted similar approaches to assessing the media's privilege from disclosing confidential sources and information. *See, e.g., Cervantes,* 464 F.2d at 992–93; *Dangerfield,* 817 F.Supp. at 837 (noting that California law requires a prima facie showing of falsity before a court will compel disclosure by a newsperson); *Bauer,* 557

N.W.2d at 612; *Hopewell v. Midcontinent Broad. Corp.,* 538 N.W.2d 780, 782 (S.D.1995).

16. The trial court imposed sanctions on Boyles under C.R.C.P. 37 that were unrelated to Boyles's refusal to reveal the identity of his news sources. *See supra* note 8. The validity of those sanctions is not before us.

■ Although the trial court did not make findings concerning the factors enumerated under section 13–90–119(3) before ordering Boyles to disclose his sources, the court did make adequate findings in its order compelling Gallegos to disclose his knowledge of Boyles's sources and their identities. However, because we instruct the trial court to reconsider its order compelling Boyles to disclose the information and because Gallegos is a non-party to Gordon's defamation suit, the trial court must reassess its order compelling Gallegos to reveal the news information about Boyles's confidential sources.

First, the trial court must reconsider its order compelling Gallegos to reveal the news information only after it completely reevaluates Boyles's assertion of the newsperson's privilege in light of our opinion today. If, after reviewing our opinion, the trial court issues an order requiring disclosure based on findings applicable to Boyles and Boyles reveals the information, then the trial court may determine that it is not necessary to compel the same information from Gallegos. *See* § 13–90–119(3)(b). On the other hand, if Boyles persists in his refusal to divulge information, then the court may determine that Gallegos represents the only reasonable means by which Gordon may obtain relevant and necessary information about Boyles's sources.

Second, in addition to requiring that the trial court refrain from compelling Gallegos to disclose the information about Boyles's sources until after making the proper findings about Boyles's assertion of the newsperson's privilege and allowing Boyles an opportunity to respond, the trial court should only require Gallegos to disclose the information after taking into consideration Gallegos's position as a non-party in this case. Unlike Boyles, Gallegos did not broadcast any reports about Gordon based on information from the confidential sources and therefore did not risk defaming Gordon or place his own state of mind at issue for purposes of a defamation suit. *See Zerilli,* 656 F.2d at 714.

For these reasons, we vacate the trial court's order compelling Gallegos to disclose the news information he learned about Boyles's sources and instruct the trial court

to reconsider any order to Gallegos in light of our discussion in this opinion. Although we vacate the trial court's order requiring Gallegos to disclose the identities of Boyles's sources, we recognize that circumstances may arise that we have neither considered nor mentioned in this opinion that would support an order compelling Gallegos to divulge the identities of and any information he learned about Boyles's sources.

■ In contrast to both Boyles and Gallegos, Jacor cannot assert the newsperson's privilege in this case. Section 13–90–119(2) only provides the privilege to those parties who possess news information "received, observed, procured, processed, prepared, written, or edited by a newsperson *while acting in the capacity of a newsperson.*" (Emphasis added). As Jacor itself asserts, Larsen and Olinger learned information about Boyles's sources only in meetings with Boyles and Jacor's and Boyles's joint attorney to discuss legal strategy in response to Gordon's contemplated lawsuit. Jacor did not learn about Boyles's sources while gathering news information "for dissemination to the public through the mass media." § 13–90–119(1)(c). For this reason, Jacor cannot rely on section 13–90–119(2) to shield it from having to disclose Boyles's sources.

## IV. ATTORNEY–CLIENT PRIVILEGE

We turn to the second issue raised by the parties in these proceedings: Jacor's claim of the attorney-client privilege. Jacor argues that the trial court improperly ordered it to reveal the names of Boyles's sources because Jacor learned the identities of the sources solely during confidential attorney-client communications. We agree.

### A. Basic Principles of the Attorney–Client Privilege

 Colorado codified the common law attorney-client privilege at section 13–90–107(1)(b), which states:

> An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment.

The privilege is "rooted in the principle that candid and open discussion by the client to the attorney without fear of disclosure will promote the orderly administration of justice." *See Law Offices of Bernard D. Morley, P.C. v. MacFarlane*, 647 P.2d 1215, 1221 (Colo.1982) (quoting *A. v. District Court*, 191 Colo. 10, 22, 550 P.2d 315, 324 (1976)). Protecting confidential communications between an attorney and a client "not only facilitates the full development of facts essential to proper representation of a client but also encourages the general public to seek early legal assistance." *National Farmers Union Property & Cas. Co.*, 718 P.2d at 1047. Despite the strong policy reasons that give rise to the privilege, the attorney-client privilege is not absolute, and when the social policies underlying the privilege conflict with other prevailing public policies, the attorney-client privilege must give way. *See Bernard D. Morley, P.C.*, 647 P.2d at 1220.

The attorney-client privilege extends only to matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations. *See id.* Furthermore, the "privilege applies only to statements made in circumstances giving rise to a reasonable expectation that the statements will be treated as confidential." *Lanari v. People*, 827 P.2d 495, 499 (Colo.1992). " 'A mere showing that the communication was from client to attorney does not suffice, but the circumstances indicating the intention of secrecy must appear.' " *D.A.S. v. People*, 863 P.2d 291, 295 (Colo.1993) (quoting John W. Strong et al., *McCormick on Evidence* § 91, at 333 (4th ed.1992)). Communications between an attorney and his client that are not confidential—i.e., communications that are disclosed to third parties outside of the attorney-client relationship [17]—are not protected. *See People v. Tippett*, 733 P.2d 1183, 1192–93 (Colo.1987) (holding that because information at issue was known to third parties and not confidential, it was not protected by the attorney-client privilege).

The United States Supreme Court noted that the attorney-client privilege protects not only information and advice communicated from the attorney to the client, but also information given to the attorney to enable him to give sound and informed legal advice. *See Upjohn*, 449 U.S. at 390, 101 S.Ct. 677. However, the privilege protects only the communications to the attorney; it does not protect any underlying and otherwise unprivileged facts that are incorporated into a client's communication to his attorney:

> The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id.* at 396, 101 S.Ct. 677 (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962)); *see also* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.6:103, at 137 (2d ed. Supp.1997) ("[T]he fact that a client has discussed facts with a lawyer does not protect *the client* from thereafter being asked about the facts ... [otherwise,] a client could immunize herself against interrogation about the facts simply by telling them to her lawyer.") (emphasis in original).

### B. Application to Jacor

The trial court concluded that Jacor's employees who learned the identities of Boyles's sources had to disclose the information about Boyles's sources even though the employees learned the information about the sources in communications with Boyles's and Jacor's joint counsel. The court determined that the identities of Boyles's sources were merely "facts" underlying attorney-client communications because they were "wholly unnecessary" to Jacor's representation. Thus, because the identities of Boyles's sources are factual information and not communications central to receiving and dispensing legal advice, the trial court refused to

---

17. We note that under some circumstances, communications to third parties remain within the scope of the attorney-client privilege. For example, under section 13–90–107(1)(b), an attorney's secretary, paralegal, legal assistant, stenographer, or clerk may not be examined about any facts learned in his capacity as an employee of the attorney. *See* § 13–90–107(1)(b).

allow Jacor's employees to claim that the attorney-client privilege protected them from disclosing the information about Boyles's sources. Although we agree with the trial court that, generally speaking, factual information revealed to an attorney does not become privilege merely because it has been revealed to counsel, we disagree with its conclusion that the attorney-client privilege does not protect Jacor's employees from having to reveal the identities of Boyles's sources.

As discussed, the scope of the attorney-client privilege does not encompass otherwise unprivileged facts disclosed in attorney-client relations, and unprivileged facts cannot become privileged merely by incorporation into a communication with an attorney. *See Westinghouse*, 205 F.Supp. at 831. Aside from Boyles's claims of the newsperson's privilege, the identities of Boyles's sources were not privileged information. Thus, because otherwise unprivileged factual information does not become privileged simply because a client divulges the information to an attorney, the trial court correctly determined that the information about Boyles's sources was not privileged merely because Boyles revealed his sources to his attorney.

Nevertheless, the information Larsen and Olinger learned about Boyles's sources is privileged because Jacor's employees learned the information about Boyles's sources only in a meeting with a co-defendant and their joint attorney during communications concerning a matter of common interest to their joint defense. The "co-defendants" or "joint clients" application of the attorney-client privilege extends the privilege to communications made between co-defendants and the attorney who represents them both, for the sake of discussing their common interests in a joint defense in civil or criminal litigation. *See, e.g., Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London*, 176

Misc.2d 605, 676 N.Y.S.2d 727, 732 (N.Y.Sup. Ct.1998) (applying New York's "common interest" test to determine whether attorney-client communications between co-defendants in a civil case are privileged).[18] The principles that support the attorney-client privilege apply equally when two or more defendants conduct a joint defense through the same attorney: co-defendants should be encouraged to disclose all information and openly discuss legal strategies with their shared attorney to promote both the complete development of their defense and the efficient administration of justice.[19] *See id.* Thus, although we have not previously recognized this application of the attorney-client privilege, we hold that it is consistent with and promotes the policies underlying Colorado's attorney-client privilege pursuant to section 13–90–107(1)(b).

The fact that Jacor's communications with counsel took place in front of a third party, Boyles, does not destroy the confidentiality of the communications because Boyles was a co-defendant discussing legal matters of common interest for both Jacor and Boyles. *See Bank Brussels Lambert v. Credit Lyonnais, (Suisse) S.A.*, 160 F.R.D. 437 at 446 (1995). Jacor learned the identities of the sources when Larsen and Olinger met with Boyles and the attorney shared by Boyles and Jacor to discuss the draft of Gordon's complaint, which named Jacor and Boyles as co-defendants. Because Jacor learned the identities of Boyles's sources solely in the context of privileged attorney-client communications, Jacor cannot be compelled to disclose Boyles's sources pursuant to section 13–90–107(1)(b). Thus, we make our rule absolute and vacate the trial court's order that Jacor disclose Boyles's sources.

## V. CONCLUSION

For the reasons stated, we reverse defendant Boyles's order of contempt and remand

---

**18.** *See also United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir.1997); *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 160 F.R.D. 437, 446–47 (S.D.N.Y.1995); 24 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5493 (1986 & 2000 Supp.) (distinguishing between "allied lawyers" application of the attorney-client privilege and the "joint clients" application of the privilege).

**19.** Although such a situation raises the issue of conflicts of interest for the attorney representing two or more clients in the same lawsuit, this issue was not raised in this case and we do not address it here. *See* 2 James Wm. Moore, *Federal Rules Pamphlet* 545–546 (2000).

this case to the trial court for further proceedings consistent with this opinion. With respect to Jacor's and Gallegos's petitions, we make our rules absolute and we vacate the trial court's orders. We return Boyles's appeal to the trial court for further proceedings consistent with this opinion.