ALLIANCE CONSTRUCTION SOLUTIONS, INC.,
Plaintiff,

v.

DEPARTMENT OF CORRECTIONS,
Defendant and Counterclaim
Plaintiff,

The American Insurance Company, a subsidiary of Fireman's Fund Insurance Company, Additional Counterclaim Defendants.

No. 02SA53.

Supreme Court of Colorado.

Sept. 9, 2002.

Rehearing Denied Oct. 7, 2002. *

* Justice BENDER does not participate.

Faegre & Benson, LLP, Janet Lawler McDaniel, J. David Arkell, Denver, Colorado, Attorneys for Alliance Construction Solutions, Inc.

Hall & Evans, LLC, Alan Epstein, Jeffery B. Stalder, Denver, Colorado, Ken Salazar, Attorney General, Karen A. Levchuk, Assistant Attorney General, Litigation Section, Denver, Colorado, Attorneys for Department of Corrections.

Myer, Swanson, Adams & Wolf, Harmon S. Graves, Denver, Colorado, Attorneys for The American Insurance Company.

Justice RICE delivered the Opinion of the Court.

The petitioner, Department of Corrections, (DOC), initiated this original proceeding pursuant to C.A.R. 21, seeking relief from a trial court order compelling the DOC to disclose documents and communications between its legal counsel and its independent contractor, CRSS Constructors, Inc., (CRSS). At issue in the underlying suit is the DOC's alleged wrongful termination of Alliance Construction Solutions' (Alliance) contract to construct the Trinidad Correctional Facility in Trinidad, Colorado. CRSS, and specifically, Dana Dietz, an employee of CRSS, served as the DOC's project manager for construction at the Trinidad facility and therefore has knowledge about the decision to terminate. During discovery, Alliance sought communications between the attorney representing the DOC and Ms. Dietz. The trial court granted Alliance's motion to compel disclosure of the documents and communications, rejecting Petitioners' argument that the attorney-client privilege protects the communications between Ms. Dietz and the DOC's legal counsel. The trial court ruled that "[t]he Defendant has failed to establish that there is [an] attorney client relationship between DOC and Dana Dietz."

We issued a rule to show cause why mandamus should not issue to require the trial court to vacate its order granting Alliance's motion to compel. Today, we adopt a four-part test to determine whether communications between a governmental entity's independent contractor and the entity's counsel are protected by the attorney-client privilege. First, we hold that for the privilege to apply the information-giver must be an employee, agent, or independent contractor with a significant relationship not only to the govern-

mental entity but also to the transaction that is the subject of the governmental entity's need for legal services. If the party seeking to exercise the privilege satisfies this preliminary requirement, we hold that the entity must also show: (2) that the communication was made for the purpose of seeking or providing legal assistance; (3) that the subject matter of the communication was within the scope of the duties provided to the entity by its employee, agent, or independent contractor; and (4) that the communication was treated as confidential and only disseminated to those persons with a specific need to know its contents.

Applying this test to the facts of this case, we conclude that Ms. Dietz is an independent contractor with a significant relationship to the DOC and to its involvement with the Trinidad project, which is the subject matter of the DOC's need for legal services. Thus, we hold that the relationship between CRSS and the DOC is one which satisfies the first part of the test we articulate today. We also hold that the communications between Ms. Dietz and the DOC's counsel satisfy the remaining elements of the test: (2) the communications were made for the purpose of seeking or providing legal assistance; (3) the subject matter of the communications was within the scope of Ms. Dietz's duties as project manager of the Trinidad site; and (4) the DOC's legal counsel regarded the communications as confidential and treated them as such. Accordingly, we make the rule absolute and direct the trial court to vacate its order.

## I. ORIGINAL JURISDICTION

Initially, we note that discovery orders are interlocutory in nature and generally not reviewable in an original proceeding. *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court,* 718 P.2d 1044, 1046 (Colo.1986). However, we may exercise our original jurisdiction when a pre-trial ruling places a party at a "significant disadvantage in litigating the merits of the controversy" and "conventional appellate remedies would prove inadequate."

*Leaffer v. Zarlengo,* 44 P.3d 1072, 1077 (Colo. 2002). Moreover, we have exercised our original jurisdiction to address issues of "significant public importance which we have not yet examined." *Id.*

The legal question of whether the attorney-client privilege protects communications between a governmental entity's attorney and its independent contractor is a matter of significant importance and one of first impression. In addition, the trial court's order compelling the DOC to produce documents and communications it claims are protected by the attorney-client privilege would place the DOC at a significant disadvantage in defending against the wrongful termination suit, and the conventional appeals process would not provide an adequate remedy since the issue will likely evade review in any eventual appeal. Accordingly, we exercise our original jurisdiction in this case.

## II. FACTS

The issue in this case arises out of a lawsuit filed in connection with the construction of the Trinidad Correctional Facility.[1] In November 1997, the DOC contracted with Alliance for the construction of the Trinidad prison. Nearly a year later, the DOC terminated its contract with Alliance, and Alliance commenced this action, alleging wrongful termination.

A legislative enactment, now repealed, provided the basis for the relationship between the DOC and CRSS. The statute called for the Department of Personnel to contract with firms or persons to provide project management services between the various contractors and the DOC. § 17–1–104.4, 6 C.R.S. (2000) (repealed 2000). Ms. Dietz is an employee of CRSS, which serves as the DOC's independent contractor. As project manager for the Trinidad Correctional Facility, Ms. Dietz is intimately involved with the specific construction project that is the focus of the underlying litigation. Ms. Dietz has been furnished an office at the Department of Corrections Headquarters Facility in Colora-

1. The trial court record in this case is not before us. We rely upon the briefs of the parties, the available pleadings and motions, and copies of the trial court's pre-trial orders for the facts of this case.

do Springs and works closely with the contractors and surety on the project.

Though the contract between the DOC and CRSS makes clear that CRSS is an independent contractor of the DOC and expressly not an employee or agent of the DOC, the Director of Facilities Services for the DOC, as well as other members of the DOC, regard Ms. Dietz as the equivalent of a DOC employee. Ms. Dietz has educated the DOC's counsel on conditions at the site, visited the site with counsel, and served as counsel's primary contact on many of the specific issues involved in the litigation. Moreover, as the "eyes and ears" of the Trinidad project, Ms. Dietz possesses information known by no one else.

## III. ANALYSIS

In this case, we must determine whether the attorney-client privilege protects communications between a governmental entity's counsel and the entity's independent contractor. Specifically, we must determine whether the attorney-client privilege protects documents and communications between the DOC's legal counsel and Dana Dietz, an employee of CRSS and the principal project and litigation contact for the DOC's counsel. While we have considered whether the attorney-client privilege protects communications between corporate employees and officers and the corporation's legal counsel, *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*, 718 P.2d 1044 (Colo.1986), we have never addressed the precise issue presented in this case. Thus, to inform our decision, we will first briefly review the nature of the attorney-client privilege. We will then analyze the attorney-client privilege in the corporate setting because it is closely analogous to the issue in the case presented here: both involve organizational clients, in one case a corporate entity and in the other a governmental one.[2] Moreover, both involve communications between the entity's counsel and individuals who are associated with the entity and the transaction that is the subject of the

entity's need for legal services in such a way that they can provide factual information needed for sound legal advice. Finally, based on these principles, as well as our review of relevant case law from our sister jurisdictions, we will determine whether application of the attorney-client privilege asserted here, involving communications between a governmental entity's counsel and the entity's independent contractor, is warranted.

## A. THE ATTORNEY–CLIENT RELATION

■ We begin with a general overview of the law pertaining to the attorney-client privilege. The privilege protects communications between attorney and client relating to legal advice. *Wesp v. Everson*, 33 P.3d 191, 196 (Colo.2001). Colorado codified the common law attorney-client privilege at section 13–90–107(1)(b), 5 C.R.S. (2001), which provides:

> An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

Attorneys serve the useful function of helping clients to navigate our often complex legal system. In order to provide effective legal advice, an attorney must have a full understanding of the facts underlying his representation. Accordingly, we have emphasized that protecting confidential communications between attorney and client "facilitates the full development of facts essential to proper representation of a client." *Gordon v. Boyles*, 9 P.3d 1106, 1123 (Colo.2000); *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*, 718 P.2d at 1047. Indeed, without the protection the privilege provides to such confidential communications, "clients

---

**2.** "The objectives of the attorney-client privilege, including the special objectives relevant to organizational clients, apply in general to governmental clients. The privilege aids government enti-

ties and employees in obtaining legal advice founded on a complete and accurate factual picture." Restatement (Third) of the Law Governing Lawyers § 74 cmt. b (2000).

may be reluctant or unwilling to seek legal advice or to confide fully in their attorney." *Wesp,* 33 P.3d at 196. Thus, we have said that "the right of parties within our justice system to consult professional legal experts is rendered meaningless unless communications between attorney and client are ordinarily protected from later disclosure without client consent." *Id.*

■ Because the effectiveness of legal representation depends in part on the attorney's ability to gain a full understanding of the factual scenario underlying the representation, we have concluded that the privilege protects not only information and advice communicated from the attorney to the client, but also communications to the attorney to enable him to give sound and informed legal advice.[3] *Gordon,* 9 P.3d at 1123 (citing *Upjohn v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *Nat'l Farmers,* 718 P.2d at 1049 (citing *Upjohn,* 449 U.S. at 390–91, 101 S.Ct. 677).

### B. ATTORNEY–CLIENT PRIVILEGE IN CORPORATE SETTING

■ While the attorney-client privilege typically protects communications between an individual client and his counsel, the privilege is also available to corporations. *A v. Dist. Court,* 191 Colo. 10, 20, 550 P.2d 315, 323 (1976). In *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the United States Supreme Court analyzed the scope of the attorney-client privilege in the corporate context. Although the application of the attorney-client privilege in the corporate setting is not directly at issue in this case, the *Upjohn* court's reasoning and its explanation of the purpose behind the attorney-client privilege—which we adopted in *National Farmers* and *Gordon*—directly impacts our decision in this case. Thus, we begin by outlining the scope of the attorney-client privilege in the corporate setting.

In *Upjohn* the United States Supreme Court considered whether communications between a corporation's employees and the corporation's legal counsel were protected by the attorney-client privilege. The IRS sought disclosure of questionnaires circulated to managers and memorandums or notes of interviews between corporate counsel and employees of the corporation resulting from an internal investigation into "questionable payments" to foreign government officials. *Upjohn,* 449 U.S. at 386–88, 101 S.Ct. 677. Upjohn refused to produce the documents, arguing that they were protected by the attorney-client privilege.[4] *Id.* at 388, 101 S.Ct. 677.

In the case below, the Sixth Circuit held that the attorney-client privilege did not apply "[t]o the extent that the communications were made by officers and agents not responsible for directing Upjohn's actions in response to legal advice ... for the simple reason that the communications were not the 'client's.' " *United States v. Upjohn Co.,* 600 F.2d 1223, 1225 (6th Cir.1979). Thus, the Sixth Circuit adopted what had become known as the "control group" test. This test provides that in the corporate setting the attorney-client privilege only protects communications between corporate counsel and "those officers, usually top management, who play a substantial role in deciding and directing the corporation's response to the legal advice given." *Id.* at 1226. Only these senior management, the Sixth Circuit reasoned, can be "said to possess an identity analogous to the corporation as a whole" and therefore be considered to communicate as the corporate client. *Id.*

The Supreme Court granted certiorari to determine the scope of the attorney-client privilege in the corporate setting and held that the communications at issue were protected by the privilege. In fact, the Court emphatically rejected the control group test

---

**3.** However, it is important to note that the privilege only protects against disclosure of communications and does not protect the underlying facts on which the communication is based. In other words, "the client may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Nat'l Farmers,* 718 P.2d at 1049 n. 3.

**4.** Upjohn also argued that the documents were protected by the work product doctrine. That argument is not relevant for the purposes of this case.

as too narrow; however, it explicitly refused to adopt a specific test to determine the parameters of the privilege in the corporate setting, instead relying on several factors to determine that the privilege applied in the case at issue. *Id.* at 395–96, 101 S.Ct. 677. The court concluded: (1) that the information, not available from higher management, was needed to supply a basis for legal advice; (2) that the communications concerned matters within the scope of the employees' corporate duties; (3) that the employees were aware that they were being questioned so that the corporation could obtain legal advice; and (4) that the communications were considered "highly confidential" when made and were kept confidential by the company. *Id.* at 394–95, 101 S.Ct. 677.

However, while the Court declined to adopt a specific test to apply in the corporate context, the reasons the Court rejected the "control group" test inform our analysis of the applicability of the attorney-client privilege in the independent contractor setting. In rejecting the control group test, the Court first noted that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn,* 449 U.S. at 390–91, 101 S.Ct. 677 (citing ABA Code of Professional Responsibility, Ethical Consideration 4–1). To do this, the Supreme Court reasoned that a corporate attorney may need " 'to glean information relevant to a legal problem from middle management or non-management personnel as well as from top executives.' " *Id.* (quoting *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 608–09 (8th Cir.1978)). Thus, the Court concluded that the control group test "frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation." *Upjohn,* 449 U.S. at 391–92, 101 S.Ct. 677.

In *National Farmers,* we applied *Upjohn* to determine whether the attorney-client privilege applied to protect a memorandum regarding a lease guaranty insurance policy against disclosure. Petitioner's outside counsel prepared the memorandum to inform the client's general counsel of the facts underlying the issuance of the policy and conclusions regarding whether a claim under the policy should have been paid. *Nat'l Farmers,* 718 P.2d at 1045–46. In preparing the memorandum, the attorneys conducted interviews with officers and employees of the corporation. *Id.* at 1049.

Though we concluded that none of the factors on which the *Upjohn* court relied were present in *National Farmers,* our analysis in *National Farmers* adopted the factors set forth in *Upjohn* and applied them to determine whether the attorney-client privilege protected communications between a corporation's officers and employees and corporate counsel. Indeed, we adopted the *Upjohn* court's reasoning that the attorney-client privilege protects communications made to the attorney to enable him to give sound and informed legal advice. *Nat'l Farmers,* 718 P.2d at 1049 (citing *Upjohn,* 449 U.S. at 390–91, 101 S.Ct. 677); *see also Gordon,* 9 P.3d at 1123 (citing *Upjohn,* 449 U.S. at 390, 101 S.Ct. 677); *Denver Post Corp. v. University of Colorado,* 739 P.2d 874, 880–81 (Colo.Ct.App.1987) (holding that communications between the University of Colorado's counsel and former employees of the University concerning activities during their period of employment may be protected by the attorney-client privilege under the rationale presented in *Upjohn,* but holding that the University waived the privilege by disclosing the documents); *Shriver v. Baskin–Robbins Ice Cream Co.,* 145 F.R.D. 112, 114 (D.Colo.1992) (citing *Upjohn* and ruling that "communications between corporate counsel and company personnel are privileged so long as they concern matters within the scope of the employee's corporate duties").

The Supreme Court's reasoning—and in turn our reasoning in *National Farmers* and *Gordon*—emphasizes the importance of applying the privilege to protect the ability of attorneys to garner needed information to provide sound legal advice. Thus, the purpose underlying the application of the attorney-client privilege in the corporate context informs our analysis of whether the privilege applies to protect communications between a

governmental entity's counsel and its independent contractor.

## C. THE ATTORNEY–CLIENT PRIVILEGE IN THE GOVERNMENTAL INDEPENDENT CONTRACTOR SETTING

■ With the foregoing principles in mind, we now turn to the ultimate question presented in this case: whether the attorney-client privilege protects communications between a governmental entity's counsel and the entity's independent contractor. Specifically, we must consider whether the purposes supporting the attorney-client privilege—including the attorney's need to gather relevant information in order to provide sound legal advice—are supported by applying the privilege to protect communications between governmental counsel and persons who, though not formally employed by the governmental entity, have the kind of significant relationship with the entity that makes it appropriate to consider them functional employees for the purposes of the privilege.

Although this Court has never considered whether the attorney-client privilege applies in the governmental independent contractor setting, the Eighth Circuit has analyzed a nearly identical question in *In re Bieter, Co.,* 16 F.3d 929 (8th Cir.1994). The question presented in *Bieter* was whether communications between a client's independent contractor and the client's counsel or communications merely disclosed to the independent contractor necessarily fell outside of the scope of the attorney-client privilege because the contractor was neither the client nor an employee of the client. *Bieter,* 16 F.3d at 934. Because we find this opinion to be persuasive, we will discuss it in some detail.

Bieter was a partnership formed to develop a parcel of farm land. The partnership retained an independent contractor to provide advice and guidance regarding commercial and retail development in the area. The contractor worked out of Bieter's office and interacted daily with the principals of the partnership to attempt to develop the parcel of land. *Bieter,* 16 F.3d at 933. A contract between the parties clarified that the contractor was expressly not an agent, employ-

ee, or partner of Bieter. *Id.* at 933–34. However, according to the independent contractor, he was viewed by government officials, potential tenants, the media, and others as a representative of Bieter. *Id.* at 934.

Ultimately, Bieter confronted various obstacles to the land development and resorted to legal action. *Id.* at 930. During discovery, respondents sought disclosure of certain documents that Bieter claimed were protected by the attorney-client doctrine. A magistrate held that the materials were not protected because they had been disclosed to the independent contractor, and the district court summarily affirmed the order. *Id.* at 931.

To determine whether the attorney-client privilege protected the communications at issue, the *Bieter* court considered two distinct questions. First, it examined whether the independent contractor's relationship to the client was the type that justified the application of the privilege. Concluding that it did, the court next considered whether the communications satisfied the test it had set out in *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1977), to analyze the applicability of the privilege in the corporate-employee context. *Bieter,* 16 F.3d at 938.

In analyzing these questions, the court relied on its earlier decision in *Diversified,* as well as the United States Supreme Court's decision in *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) that had both analyzed a similar question: whether the attorney-client privilege protects communications between a corporation's employees and corporate counsel. The Eighth Circuit concluded: "[I]t is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors. Such a distinction is consistent with neither the Supreme Court's decision in *Upjohn* nor our decision in *Diversified.*" *Bieter,* 16 F.3d at 937.

Since the *Upjohn* Court emphasized that "[t]he lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out," *Bieter* reasoned

that refusing to apply the privilege to protect communications between a client's independent contractor and the client's counsel would frustrate the very purpose of the privilege as explicated by *Upjohn.* In other words, a failure to extend the attorney-client privilege to the independent contractor context would limit the ability of the lawyer to ascertain needed facts for sound representation.

Thus, the *Bieter* court concluded " 'at times there will be potential information-givers who are not employees of the corporation but who are nonetheless meaningfully associated with the corporation in a way that makes it appropriate to consider them 'insiders' for purposes of the privilege.' " *Bieter,* 16 F.3d at 936 (quoting John E. Sexton, *A Post Upjohn Consideration of the Corporate Attorney Client Privilege,* 57 N.Y.U. L.Rev. 443, 490 (1982)). Accordingly, the Eighth Circuit ruled that the attorney-client privilege should extend to relationships where the information-giver is "an employee, agent, or independent contractor with a significant relationship to the corporation and the corporation's involvement in the transaction that is the subject of legal services." *Bieter,* 16 F.3d at 937 (quoting Sexton, 57 N.Y.U. L.Rev. at 487).

In sum, since the privilege exists to protect not only information communicated from attorney to client, but also information provided to the attorney so that he may give sound legal advice, the Eighth Circuit reasoned that no principled basis existed to distinguish between a client's employee and its independent contractor. Both may have extremely sensitive and important information that must be communicated to the lawyer in order for him to provide effective representation. *Bieter,* 16 F.3d at 937. Thus, the court held that the *Diversified* test applied not only in the corporate employee context, but also in the independent contractor context. *Id.* at 937–38.

In applying these legal principles, the *Bieter* court first held that the client's relationship with its independent contractor justified application of the privilege. The contractor had been involved on a daily basis with the partnership's principals and on behalf of the partnership in the unsuccessful development that served as the basis for the litigation. Moreover, the contractor had been intimately involved with the sole objective of the partnership: to develop the parcel of land. Importantly, as the partnership's sole representative at meetings with potential tenants and other officials, he likely possessed information that no one else knew. Thus, the *Bieter* court concluded that the contractor "was in all relevant respects the functional equivalent of an employee." *Bieter,* 16 F.3d at 938.

Next, the *Bieter* court applied the *Diversified* test, which it had originally developed to determine whether communications between a corporation's employees and corporate legal counsel were protected. The test provides that the attorney-client privilege protects communications if: (1) the communication was made for the purpose of securing legal advice; (2) the person making the communication did so at the direction of his superior; (3) the superior requested that the communication be made so that the client could secure legal advice; (4) the subject matter of the communication was within the scope of the representative's duties; and (5) the communication was not disseminated beyond those persons, who because of the structure of the client's operations, needed to know its contents. *Bieter,* 16 F.3d at 938–39. The court held that each of these elements were satisfied, and therefore, the privilege applied to communications made between the client's independent contractor and the client's attorney and that the disclosure of otherwise privileged documents to the independent contractor in the course of his confidential communications with counsel did not destroy the privilege. *Id.* at 939–40; *see also Energy Capital Corp. v. United States,* 45 Fed. Cl. 481, 491–92 (Fed.Cl.2000) (adopting the rule recognized in *Bieter,* but ruling that it could not decide whether the relationship between the client and its agents met the *Bieter* requirements because the plaintiff failed to present appropriate facts); *In re Copper Mkt. Antitrust Litig.,* 200 F.R.D. 213, 219 (S.D.N.Y.2001) (following *Bieter* and concluding that client's independent public relations firm was the functional equivalent of

an in-house public relations department and therefore communications between it and the client or client's counsel were protected by the attorney-client privilege); *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D.Cal.1990) (finding attorney-client privilege inapplicable for other reasons, but relying on *Upjohn* and concluding that because independent consultant acted within scope of employment and under direction of supervisor, no principled reason existed to distinguish between the independent consultant and an employee for purposes of the attorney-client privilege). *But see Miramar Constr. v. Home Depot, Inc.*, 167 F.Supp.2d 182, 185 (D.P.R.2001) (refusing to apply the attorney-client privilege to protect communications between corporate counsel and the corporation's former independent contractor).

We find the *Bieter* court's analysis persuasive and conclude that there are circumstances when the attorney-client privilege protects communications between a governmental entity's independent contractor and the entity's counsel. Moreover, this conclusion comports with our reasoning in *Gordon v. Boyles*, 9 P.3d 1106 (Colo.2000) and *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*, 718 P.2d 1044 (Colo.1986). Because we have concluded that the attorney-client privilege protects communications made to the attorney in order for him to provide sound legal advice, *Gordon*, 9 P.3d at 1123; *Nat'l Farmers*, 718 P.2d at 1049, we agree with the *Bieter* court that a formal distinction between an employee and an independent contractor conflicts with the purposes supporting the privilege. An independent contractor with a meaningful relationship to the governmental entity may possess important information needed by the attorney to provide effective representation.

Accordingly, we hold that for the attorney-client privilege to apply in the context at issue, the information-giver must be an employee, agent, or independent contractor with a significant relationship not only to the governmental entity but also to the transaction that is the subject of the governmental entity's need for legal services. Thus, the type of relationship between the client and the information-giver must be closely analyzed to determine the application of the privilege.[5]

If the party seeking to protect the communications satisfies the first part of the test, we also hold that the entity must show three additional elements. First, it must demonstrate that the communication was made for the purpose of seeking or providing legal assistance. We use the term "assistance" rather than the *Bieter* court's term "advice" because we believe the term "advice" could be read too narrowly. *See* Sexton, supra at 490 (The term advice "though understandable, overlooks the fact that attorneys perform professional services that often do not entail advice to the client—for example, the administration of an estate or the litigation of an antitrust matter."); *see also* Restatement (Third) of the Law Governing Lawyers § 68 (2000) (delineating the general attorney-client privilege and stating that for it to apply the communication must be made between privileged persons in confidence for the purpose of obtaining or providing legal *assistance* for the client) (emphasis added).

Second, we hold that the entity must show that the subject matter of the communication was within the scope of the duties provided to the entity by its employee, agent, or independent contractor. Although the *Bieter* court also required the party seeking to apply the privilege to show that the person making the communication did so at the direction of the superior and that the superior requested that the communication be made

5. We note that while we have relied on cases from the corporate or partnership context as support for our opinion, we find no reason to differentiate between these entities and a governmental client. Rather, we agree with the drafters of the Restatement of the Law Governing Lawyers that: "The objectives of the attorney-client privilege, including the special objectives relevant to organizational clients, apply in general to governmental clients. The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture. Communications from such persons should be correspondingly privileged." Restatement (Third) of the Law Governing Lawyers § 74 cmt. b (2000). A different rule may apply, however, if one agency of government claims the privilege in resisting a demand for information from another. We do not analyze that issue in this opinion.

so that the client could secure legal advice, we believe these two elements of the *Bieter* test do not comport with the purposes underlying the privilege. We agree with Sexton's analysis that employees, agents, and independent contractors should not be discouraged from independently communicating with the attorney. Furthermore, we agree that "a requirement that communication with the attorney be authorized by a superior, if taken literally, would bar application of the privilege to communications with former employees ... even former employees who were directly involved in matters under investigation by the attorney." Moreover, there may be times when an attorney may speak with the independent contractor, agent, or employee directly, without obtaining the superior's consent or direction. Sexton, 57 N.Y.U. L.Rev. at 499–500. If we were to require that the information-provider do so only at the direction of his superior this would conflict with our reasoning that the attorney-client privilege protects communications necessary to provide the factual basis on which to provide sound legal assistance.

Finally, we hold that an entity seeking to apply the privilege in the independent contractor context must show that the communication was treated as confidential and only disseminated to those persons with a specific need to know its contents. In fact, we have emphasized that the " 'privilege applies only to statements made in circumstances giving rise to a reasonable expectation that the statements will be treated as confidential.' " *Gordon*, 9 P.3d at 1123 (quoting *Lanari v. People*, 827 P.2d 495, 499 (Colo.1992)).

## IV. APPLICATION

■ In analyzing whether the DOC has shown that the communications at issue are protected by the attorney-client privilege, we begin by considering the relationship between Ms. Dietz and the DOC. Here, it is clear that Ms. Dietz, though an independent contractor of the DOC, has a significant relationship to the DOC and its involvement with the Trinidad project, which is at issue in the

underlying litigation. As the project manager for the Trinidad Correctional Facility project, Ms. Dietz is intimately involved with the factual investigation of the claims and defenses of the parties involved in the litigation.[6] Ms. Dietz educated the DOC's counsel on conditions at the site, visited the site with counsel, and served as counsel's primary contact on many of the specific issues involved in the litigation. In addition, as the "eyes and ears" of the Trinidad project, Ms. Dietz possesses information that no one else knows. Although the contract between CRSS (Ms. Dietz's employer) and the DOC makes clear that CRSS is not an agent or employee of the DOC, Ms. Dietz has been furnished an office at the Department of Corrections Headquarters Facility in Colorado Springs and has access to DOC staff. She represents the DOC at meetings with the contractor or surety and is regarded by Mr. Nolin Renfrow, the Director of Facilities Services for the DOC, as well as other members of the DOC, as the equivalent of a DOC employee. Ms. Dietz has provided the DOC's counsel with factual information needed to obtain satisfactory legal advice. Accordingly, it is clear that Ms. Dietz has a significant relationship with the DOC and its involvement in the Trinidad project, and thus, the relationship between CRSS and the DOC satisfies the first element of the test we articulate today.

Second, the affidavits submitted by Petitioners indicate that Ms. Dietz served as the primary contact for the DOC's counsel on many of the issues in litigation. Indeed, the DOC's attorney's affidavit stated that Ms. Dietz was the primary source of information on which legal decisions were made. Thus, Petitioners have shown that the communications were made primarily for the purpose of seeking or providing legal assistance.

Third, the subject matter of the communications was certainly within the subject matter of the independent contractor's duties. As noted above, Ms. Dietz served as the project manager for the Trinidad Correctional Facility. This construction was the sub-

---

6. Our application of the test we articulate today is supported by facts from affidavits submitted by Petitioners, including sworn statements by Ms. Dietz, DOC's counsel, and Mr. Nolin Renfrow, the Director of Facilities Services for the DOC.

ject matter at issue in the litigation and the topic of the communications between Ms. Dietz and the DOC's counsel. Indeed, Ms. Dietz educated counsel on conditions at the site and served as counsel's primary contact on many of the specific issues involved in the litigation. Thus, it is clear that the topic of communications was within Ms. Dietz's duties as project manager.

Finally, the DOC's attorney's affidavit indicates that counsel understood that Ms. Dietz served as a representative of the client for purposes of communicating the facts necessary to provide effective legal assistance. In fact, counsel stated that she intended to keep her conversations with Ms. Dietz confidential. Moreover, because counsel understood her communications with Ms. Dietz to be confidential she disclosed highly confidential information to Ms. Dietz in order to provide the DOC reliable legal advice. Therefore, the DOC has met the final confidentiality requirement.

Accordingly, Petitioners have satisfied every element of the test we adopt today. First, CRSS is an independent contractor with a significant relationship to the DOC and its litigation concerning the Trinidad project. Thus, the parties' relationship is the type justifying the application of the attorney-client privilege. Second, the purpose of the communications was to gain or provide legal assistance: Ms. Dietz communicated to counsel in order to give her the factual background of the Trinidad project, at issue in the litigation. Third, the subject matter of the communication was clearly within the scope of Ms. Dietz's responsibilities as project manager. Finally, the communications were considered confidential and treated as such.

## V. CONCLUSION

We hold that the attorney-client privilege protects the communications between CRSS and the DOC. We make the rule absolute and direct the trial court to vacate its order compelling Petitioners to disclose communications and documents between Ms. Dietz and the DOC.

Justice BENDER does not participate.